UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

LOUIS VUITTON MALLETIER, S.A., a French
*Societe Anonyme*,

                              Plaintiff,

             -against-

HYUNDAI MOTOR AMERICA, a California
Corporation,

                              Defendant.

----------------------------------------------------------x

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-22-12
```

10 Civ. 1611 (PKC)

MEMORANDUM
AND ORDER

P. KEVIN CASTEL, District Judge:

During the post-game show of the 2010 Super Bowl, defendant Hyundai
Motor America ("Hyundai") debuted a commercial that its counsel describes as "a
humorous, socio-economic commentary on luxury defined by a premium price tag, rather
than by the value to the consumer." (Def. Mem. at 2.) The ad, which would eventually
air five times over the course of a month, included a one-second shot of a basketball
decorated with a distinctive pattern resembling the famous trademarks of plaintiff Louis
Vuitton Malletier, S.A. ("Louis Vuitton").

Louis Vuitton has asserted trademark and unfair competition claims under
New York and federal law, alleging that the commercial diluted and infringed its marks.
Discovery in this case is now closed. Louis Vuitton moves for summary judgment on its
trademark dilution claims as to liability only, and Hyundai has moved for summary
judgment in its favor on all claims.

For the reasons explained, Louis Vuitton's motion is granted and
Hyundai's motion is denied.

BACKGROUND

The following facts are either undisputed or described in the light most favorable to Hyundai as the non-movant.  See, e.g., Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).[1]

A.  Hyundai's Use of Louis Vuitton Markings in the "Luxury" Ad.

Hyundai's thirty-second commercial goes by the name "Luxury."  (Def. Opp. 56.1 ¶ 2; Pl. Opp. 56.1 Resp. ¶ 2.)  It consists of brief vignettes that show "policemen eating caviar in a patrol car; large yachts parked beside modest homes; blue-collar workers eating lobster during their lunch break; a four-second scene of an inner-city basketball game played on a lavish marble court with a gold hoop; and a ten-second scene of the Sonata driving down a street lined with chandeliers and red-carpet crosswalks."  (Def. Opp. 56.1 ¶ 5; Pl. Opp. 56.1 ¶ 5.)

The commercial's "scene of an inner-city basketball game" features "a basketball bearing marks similar, but not identical," to the Louis Vuitton marks.  (Def. Opp. 56.1 ¶¶ 5, 6.)  Louis Vuitton characterizes the vignette as "a street-yard basketball scene in which it would use a basketball with markings copied from the design and colors of the [Louis Vuitton] Marks, altering them only slightly."  (Pl. 56.1 ¶ 12; Def. 56.1 Resp. ¶ 12.)

The Louis Vuitton marks are known as the "toile monogram."  As described by Hyundai, it "consists of a repeating pattern design of the letters 'LV' and flower-like symbols on a chestnut-brown background."  (Def. 56.1 ¶ 7; Pl. 56.1 Resp. ¶

---

[1] The background section addresses facts pertaining to Louis Vuitton's motion for summary judgment, and therefore describes the facts in the light most favorable to Hyundai as the non-movant.  When addressing Hyundai's motion for summary judgment, the record is construed in the light most favorable to Louis Vuitton as the non-movant.

7.)  In the cease-and-desist letter that it would send to Hyundai after the ad's initial

broadcast, Louis Vuitton described the marks as having "three distinctive elemental

designs – a pinwheel design, a diamond with an inset pinwheel design, and a circle with

an inset flower design . . . ."  (Shapiro Dec. Ex. 22 at 1.)  Louis Vuitton first registered

this mark with the United States Patent and Trademark Office in 1932, and subsequently

registered the mark's individual elements.  (Def. 56.1 ¶¶ 8-9; Pl. 56.1 Resp. ¶¶ 8-9.)  The

most prominent alteration in the "Luxury" ad was the substitution of the letters "LZ" for

"LV," although Hyundai made small modifications to the other elements of the mark,

including slight alterations to their proportions.  (See, e.g., Kruse Dec. Ex. I.)

According to Hyundai, the commercial sought to "emphasize" the "style,

quality and amenities" of the 2011 Sonata, "a mid-sized Sedan priced at approximately

$20,000."  (Def. 56.1 ¶¶ 1, 2.)  As described by Hyundai, the "Luxury" ad

> sought to redefine the concept of luxury by communicating
> to consumers that Sonata offered "luxury for all."   The
> Commercial attempted to accomplish this goal by poking
> fun at the silliness of luxury-as-exclusivity by juxtaposing
> symbols of luxury with everyday life (for example, large
> yachts parked beside modest homes).

(Def. 56.1 ¶ 2.)  As further explained by Hyundai, "The symbols of 'old' luxury,

including the [Louis Vuitton] Marks, were used as part of the Commercial's humorous

social commentary on the need to redefine luxury during a recession . . . .  The

commercial poked fun at these symbols of 'old' luxury to distinguish them from

[Hyundai] in an effort to challenge consumers to rethink what it means for a product to be

luxurious."  (Def. 56.1 ¶ 17.)  In Hyundai's view, the ad sought "to distinguish [Louis

Vuitton] from the common-sense Sonata."  (Def. 56.1 ¶ 18.)

Hyundai does not dispute that the Louis Vuitton marks "are famous and distinctive" as "widely recognized luxury marks," and are "viewed by some as the most valuable luxury brand in the world."  (Pl. 56.1 ¶¶ 32, 38, 62; Def. 56.1 Resp. ¶¶ 32, 38, 62.)  While the parties set forth slight and immaterial differences in their characterizations of the basketball's design, they agree that the ball was intended to evoke "the original Louis Vuitton Toile Monogram . . . ."  (Pl. 56.1 ¶ 13; Def. 56.1 Resp. ¶ 13; Kruse Dec. Ex. L at 147-47.)  Christopher J. Perry, a former marketing executive at Hyundai, confirmed in a Rule 30(b)(6) deposition that Hyundai worked to "genericize[ ] the Louis Vuitton marks" so "that they remained very similar" to the brown-and-gold marks of Louis Vuitton.  (Def. 56.1 Resp. ¶ 13.)  Perry said that "the brown and gold of [Louis Vuitton]" were intended to give the basketball a "more stylized and luxurious look to it," and that these colors were "a distinctive special reference" that was "tied to Louis Vuitton."  (Def. 56.1 Resp. ¶¶ 13, 16; Kruse Dec. Ex. L at 145, 141.)  At deposition, Perry testified as follows:

> Q:  [Y]ou wanted to create an association with Louis Vuitton, isn't that true?
> Mr. Perry: With luxury.  Yes.
> Q:  Right.  Because in your view Louis Vuitton is very, very distinctive and a sign of luxury, correct?
> Hyundai counsel: [Objection.]
> Mr. Perry:  Louis Vuitton, the brown and gold convey luxury.

(Pl. 56.1 ¶ 46; Def. 56.1 Resp. ¶ 46; Kruse Dec. Ex. L at 144.)  Liz Boone, an account executive at the advertising firm overseeing the "Luxury" ad, confirmed that the design was intended to evoke "Louis Vuitton in particular."  (Def. 56.1 Resp. ¶ 16; Kruse Dec. Ex. M at 119.)  She testified that the design "came out of somebody's imagination, so there was nobody to go seek permission from."  (Def. 56.1 Resp. ¶ 14; Kruse Dec. Ex. M

at 46.)  According to Hyundai, its advertising firm designed the basketball pattern in hopes of "evoking luxury" through the "telltale signs of high-end fashion goods."  (Def. 56.1 ¶ 16.)  Joel Ewanick, a former Hyundai marketing executive, testified in deposition that Hyundai designed "a brown basketball as you'd expect with some gold emblems on it to represent luxury definitely laddering and borrowing equity from Louis Vuitton.  And I believe we changed as much as we could to make it so it wasn't a complete logo.  But [we] tried to make it look like that so we would get that quick reference to luxury and people would get the luxury reference quickly.  It was the simplest thing."  (Pl. 56.1 ¶ 43; Def. 56.1 Resp. ¶ 43; Kruse Dec. Ex. B at 61.)

The "Luxury" ad was motivated in part by a desire on the part of Hyundai to change its brand image among consumers.  As described by Hyundai, "among those who highly considered but did not purchase an earlier model of the Sonata, brand reputation and resale value were the main reasons for rejection."  (Def. 56.1 Resp. ¶ 64.) As Ewanick testified:

> The Hyundai brand is one with significant deficiencies when you ask consumers what they think about safety, what you think about amenities, what you think about styling, what you think about performance.  .  .  .  But I would say generally speaking the idea was to reframe the way people looked at Hyundai, the brand, and specifically through the eyes of the Sonata.  .  .  .  As I recall, the one that you're referring to with the Louis Vuitton in it had a reference to luxury and how there's an immense amount of amenities that you would get in a Sonata that you would expect to find in luxury brands.

(Def. 56.1 Resp. ¶ 2; Kruse Dec. Ex. B at 78-79.)  Ewanick, who had been at Hyundai at the time the ad was developed, testified that it was "[c]orrect" to say that Hyundai "used

the Louis Vuitton[-]like marks in order to raise the image of the Hyundai brand in the

mind of the consumer[.]"  (Pl. 56.1 ¶ 69; Def. 56.1 Resp. ¶ 69.)

        Elsewhere, Hyundai states that it "objects to [Louis Vuitton's] implication

that the sole and immediate purpose of the campaign was to sell cars.  Rather, the

admissible evidence demonstrates [Hyundai's] goal to build consideration and awareness

and try to change the brand perception long term."  (Def. 56.1 Resp. ¶ 3; quotation marks

and alteration omitted.)

        **B.  Hyundai Previously Sought, But Did Not Receive, Permission to**
            **Display Several Luxury Marks in Its Commercial.**

        Before going forward with the final version of "Luxury," Hyundai

requested permission from numerous companies to display their luxury marks in a

commercial.  Hyundai's outside advertising firm contacted thirteen companies to see

whether they would permit Hyundai to use their brands free of charge.  (Pl. 56.1 ¶¶ 10,

65; Def. 56.1 Resp. ¶¶ 10, 65.)  In a never-broadcast vignette, Hyundai displayed "a

vending machine that dispensed luxury handbags . . . ."  (Def. 56.1 Resp. ¶ 8.)  Six

brands (Chanel, Prada, Coach, Yves Saint Laurent, Chloe, Gucci and Ferragamo)

expressly declined consent.  (Def. 56.1 Resp. ¶¶ 10, 66.)  Others (Fendi, Chloe,[2] Dolce &

Gabbana, Marc Jacobs, Burberry and Louis Vuitton) never responded to the request.  (Pl.

56.1 ¶ 11; Def. 56.1 Resp. ¶¶ 10, 11, 66.)  As described by Hyundai's counsel, "it does

not appear" that its outside advertising firm "ever spoke with anyone at [Louis Vuitton]

about this Commercial."  (Def. Opp. 56.1 ¶ 22; Pl. Opp. 56.1 Resp. ¶ 22.)  An e-mail of

November 19, 2009 sent within Hyundai's outside advertising firm states that as to

permission from Louis Vuitton: "have not been able to get a return phone call – email has

---

[2] Presumably in error, Hyundai lists Chloe as both expressly declining and never responding to the request.
(Def. 56.1 Resp. ¶ 10.)

not been sent." (Shapiro Dec. Ex. 34.)  A separate e-mail in the chain states:

"Unfortunately we have not found one who would be open to participating yet." (Shapiro

Dec. Ex. 34.)

> ### C.   Hyundai's Continued Airing of "Luxury."

The "Luxury" ad first ran during the Superbowl post-game show of

February 7, 2010, following the New Orleans Saints' 31-17 victory over the Indianapolis

Colts.  (Def. Opp. 56.1 ¶ 35; Pl. Opp. 56.1 Resp. ¶ 35; Kruse Dec. Ex. K.)  On February

12, 2010, Louis Vuitton sent Hyundai a cease-and-desist letter objecting to the inclusion

of Louis Vuitton imagery in the "Luxury" ad.  (Def. Opp. 56.1 ¶ 26; Pl. Opp. 56.1 Resp.

¶ 26; Pl. 56.1 ¶ 22; Def. 56.1 Resp. ¶ 22.)  By then, Hyundai had already arranged for

"Luxury" to air three times during the NBA All-Star Game weekend, over February 12-

14, 2010.  (Def. 56.1 ¶ 25; Pl. 56.1 Resp. ¶ 25.)  Hyundai executives decided to wait for

an opinion from legal counsel before taking action on the ad, and went forward with the

plan to run the ad during the NBA programming.  (Def. Opp. 56.1 ¶¶ 27-29; Pl. Opp.

56.1 Resp. ¶¶ 27-29; Pl. 56.1 ¶ 23; Def. 56.1 Resp. ¶ 23.)

Louis Vuitton commenced this litigation on March 1, 2010.  (Def. Opp.

56.1 ¶ 30; Pl. Opp. 56.1 Resp. ¶ 30; Pl. 56.1 ¶ 26; Def. 56.1 Resp. ¶ 26.)  Hyundai

executives "took the complaint under advisement," and again aired the commercial

during the 9 p.m. hour of the Academy Awards on March 7, 2010.  (Def. Opp. 56.1 ¶¶

31-32; Pl. Opp. 56.1 Resp. ¶¶ 31-32; Pl. 56.1 ¶¶ 27, 31; Def. 56.1 Resp. ¶¶ 27, 31.)

> ### D.   Procedural History.

Louis Vuitton commenced this action on March 1, 2010.  (Docket # 1.)

On April 19, 2010, Louis Vuitton filed an Amended Complaint that asserts five causes of

action.  (Docket # 8.)  Count I asserts trademark dilution by blurring and/or tarnishment under the Lanham Act, 15 U.S.C. § 1125(c); Count II asserts trademark dilution under New York General Business Law § 360-*l*; Counts III and V assert trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and 1114(1); and Count IV asserts common-law unfair competition under New York law.  (Am. Compl. ¶¶ 47-77.)

Louis Vuitton moves for summary judgment in its favor only as to liability under Counts I and II, including willfulness for any dilution.  Hyundai moves for summary judgment in its favor on all five counts.

SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, sufficient to demonstrate that he or she is entitled to relief as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'"  Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).

A fact is material if it "might affect the outcome of the suit under the governing law," meaning that "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  The Court must view the evidence in the light most favorable to the non-moving

party and draw all reasonable inferences in its favor, and may grant summary judgment

only when no reasonable trier of fact could find in favor of the nonmoving party.

Costello, 632 F.3d at 45; accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 585-88, (1986). In reviewing a motion for summary judgment, the court may

scrutinize the record, and grant or deny summary judgment as the record warrants.  Rule

56(c)(3).  In the absence of any disputed material fact, summary judgment is appropriate.

Rule 56(a).

　　　　　"A party opposing summary judgment does not show the existence of a

genuine issue of fact to be tried merely by making assertions that are conclusory or based

on speculation."  Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290,

310 (2d Cir. 2008) (internal citation omitted); see also Anderson, 477 U.S. at 249-50

(summary judgment may be granted if the opposing evidence is "merely colorable" or

"not significantly probative") (citations omitted).  An opposing party's facts "must be

material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant,

gossamer inferences, conjectural, speculative, nor merely suspicions."  Contemporary

Mission, Inc. v. U.S. Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir. 1981) (quotation marks

omitted).

DISCUSSION

I.   SUMMARY JUDGMENT IS GRANTED TO LOUIS VUITTON ON ITS
     CLAIMS OF DILUTION BY BLURRING.

　　　　　At 15 U.S.C. § 1125(c)(1), the Trademark Dilution Revision Act of 2006

(the "TDRA") states:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

Although this provision speaks only of injunctive relief, at 15 U.S.C. § 1125(c)(5)(B), the statute separately provides for money damages under 15 U.S.C. § 1117(a), in the event of a willful violation. See generally Sporty's Farm LLC v. Sportsman's Market, Inc., 202 F.3d 489, 500 (2d Cir. 2000) (discussing willfulness requirement).

The federal anti-dilution statute "is designed solely for the benefit of sellers. Its purpose is to protect the owners of famous marks from the kind of dilution that is permitted by the trademark laws when a junior user uses the same mark in a non-confusing way in an unrelated area of commerce." TCPIP Holding Co. v. Haar Commc'ns, Inc., 244 F.3d 88, 95 (2d Cir. 2001). It applies "regardless of the absence of competition or confusion." Id. In addition, the 2006 amendments eliminated a requirement that a plaintiff prove actual dilution: under the TDRA, a plaintiff need establish only likely dilution. See, e.g., Burberry Ltd. v. Euro Moda, Inc., 2009 WL 1675080, at *8-9 (S.D.N.Y. June 10, 2009) (comparing TDRA with prior anti-dilution provisions).

There are two types of dilution: blurring and tarnishment. "[B]lurring is an 'association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark.'" Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 105 (2d Cir. 2009) (quoting 15 U.S.C. §

1125(c)(2)(B)); see also Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 111 (2d Cir. 2010)

(blurring is "the whittling away of [the] established trademark's selling power through its

unauthorized use by others.") (alteration in original; quotation marks omitted).   As noted,

the statute states that blurring may occur regardless of actual or likely confusion,

competition or economic injury.  Starbucks, 588 F.3d at 105 (citing 15 U.S.C. §

1125(c)(1)).  "Some classic examples of blurring include 'hypothetical anomalies as

Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and

so forth.'"  Id. (quoting Mead, 875 F.2d at 1031).  As discussed below, the TDRA sets

forth six non-exclusive factors that go toward blurring.  15 U.S.C. § 1125(c)(2)(B).

> The TDRA also includes a fair use provision:
>
> The following shall not be actionable as dilution by blurring or dilution by tarnishment under this subsection:
>
>> (A) Any fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with--
>>> (i) advertising or promotion that permits consumers to compare goods or services; or
>>> (ii) identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.

15 U.S.C. § 1125(c)(3).  Hyundai argues, among other things, that the "Luxury" ad

qualifies as fair use under section 1125(c)(3)(A)(ii).

      To date, the Second Circuit's most comprehensive discussion of the

TDRA is set forth in Starbucks Corp., 588 F.3d at 105-13.  In that case, the coffee retailer

Starbucks brought dilution claims against a company that marketed and sold a coffee

branded "Charbucks Blend" and "Mister Charbucks."  Id. at 103.  The Charbucks logo

did not resemble the Starbucks marks.  Id. at 103, 106-07.  Following a bench trial in which the district court concluded that defendants had not diluted the Starbucks marks, the Second Circuit affirmed in part, vacated in part and remanded, noting that the district court did not consider each of the six TDRA blurring factors, 15 U.S.C. § 1125(c)(2)(B), and instead placed undue weight solely on the marks' lack of similarity.  Id. at 107-09.

A.   Louis Vuitton Has Established Blurring Under the TDRA.

The TDRA sets forth six non-exclusive factors that go toward dilution by blurring.  They are: (i) the degree of similarity between defendant's mark and the famous mark; (ii) the distinctiveness of the famous mark; (iii) whether the famous mark's owner "is engaging in substantially exclusive use of the mark;" (iv) the degree of recognition of the famous mark; (v) whether the defendant intended to create an association with the famous mark; and (vi) actual association between the defendant's mark and the famous mark.  15 U.S.C. § 1125(c)(2)(B).  Starbucks explained that no single factor is outcome-determinative, and concluded that a district court erred by focusing on the similarity of marks to the exclusion of other factors.  588 F.3d at 108-09.

1.   The Marks Have a High Degree of Similarity

Under the TDRA, to successfully prove blurring, a plaintiff need not establish "substantial similarity," and a court considers the "degree of similarity" as one of six probative factors.  See Starbucks, 588 F.3d at 107-08 (comparing TDRA criteria to previous dilution standard).   "Still, a finding that two marks lack similarity is probative." Miss Universe, L.P. v. Villegas, 672 F. Supp. 2d 575, 593 (S.D.N.Y. 2009).

The Louis Vuitton marks and the basketball design in "Luxury" are virtually indistinguishable.  They feature highly similar geometric designs stamped in

gold, set against a brown background.  When closely scrutinized, the design in the

Hyundai commercial includes the stylized initials "LZ," as opposed to Louis Vuitton's

"LV."  (Kruse Dec. Ex. K at 5:29.)  The "LZ" and the "LV" are portrayed in similar

script and design.  (Kruse Dec. Ex. K at 5:29.)

        As set forth in <u>Starbucks</u>, the context of the marks' use is central to a

similarity analysis.  588 F.3d at 106-07.  Hyundai argues that, rather than making a side-

by-side comparison of the designs, the context of "Luxury" underscores the

dissimilarities between Hyundai and Louis Vuitton.  In this case, however, the brief

appearance of the Louis Vuitton-like marks heightens the similarities.  Absent

exceedingly close scrutiny, the component elements of the Louis Vuitton Toile

Monogram, and their overall effect, are virtually indistinguishable from Hyundai's

stylized basketball design.  Indeed, the brevity of the basketball's appearance in the

"Luxury" ad, totaling approximately one second, renders it more difficult to assess the

minor differences between the Louis Vuitton marks and Hyundai's alterations.  This

similarity was intended by Hyundai.  As Ewanick testified, the ball's design was intended

to "register luxury with the snap of the fingers."  (Pl. 56.1 ¶ 18; Def. 56.1 Resp. ¶ 18.)

Considered in context, the ball's fleeting appearance in "Luxury" heightens the

similarities between Louis Vuitton's marks and the Hyundai design.

        Hyundai also argues that because Louis Vuitton does not produce sporting

items or automobiles, there is no similarity between the marks.  It asserts that "[a]

rational person" viewing the "Luxury" ad would view "the couture basketball" as "utterly

distinct from the ever-practical Sonata."  (Def. Opp. Mem. at 14.)  In support of its

motion, Louis Vuitton submits evidence that it has sold limited-edition soccer balls in

honor of the 1998 World Cup in France,[3] soccer cleats, a croquet set, "pétanque balls," golf bags and tennis bags.  (Pl. 56.1 ¶ 61 & Kruse Dec. Exs. hh-mm.)  Louis Vuitton also notes that it "has enjoyed a strong association with the automobile industry for nearly one hundred years," and has submitted a color photocopy of a book titled "Louis Vuitton: The Art of the Automobile."  (Pl. 56.1 ¶ 60 & Kruse Dec. Ex. gg.)  The photo-intensive book asserts claims such as, "[t]he paths of the Louis Vuitton company and the automobile world have often crossed," and offers detailed accounts of "the Louis Vuitton Classic," a series of annual events that includes awards to rare and vintage automobiles.  (Kruse Dec. Ex. gg at, e.g., LOUV 00506, 00631.)  Hyundai does not contend that the book is inadmissible hearsay, only that its sales volume in the United States is not set forth in the record.  (Def. 56.1 Resp. ¶ 60.)  Drawing every favorable inference in favor of Hyundai, and assuming that the sales volume and public awareness of Louis Vuitton's sports- and auto-related products in the United States are limited to a niche market, the record nevertheless indicates that Louis Vuitton has had an ongoing, if limited, presence in the sales and marketing of sports- and auto-related goods.  In this respect, Hyundai has not come forward with facts to support its dissimilarity argument.

        Louis Vuitton has submitted evidence that the "Luxury" basketball design is highly similar to its own famous marks, and Hyundai has not come forward with evidence that would permit a reasonable juror to conclude otherwise.

---

[3] The record includes a photograph from the January 28, 1999 edition of the Los Angeles Times showing basketball star Shaquille O'Neal wearing a Lakers jersey and posing with five Louis Vuitton soccer balls. (Kruse Dec. Ex. hh at LOUV 00768.)

### 2.  The Louis Vuitton Marks Are Distinct.

The greater a mark's distinctiveness, the higher its degree of protection under dilution law.  Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 217 (2d Cir. 1999), abrogated on other grounds, Moseley v. V Secret Catalogue, Inc., 537 U.S. 418 (2003).

Hyundai acknowledges that the Louis Vuitton marks "are famous and distinctive" as "widely recognized luxury marks," and are "viewed by some as the most valuable luxury brand in the world."  (Pl. 56.1 ¶¶ 32, 38, 62; Def. 56.1 Resp. ¶¶ 32, 38, 62.)  They are entitled to a high degree of protection.  Cf. Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 116 (2d Cir. 2006) (concluding that a "new Multicolore" of the Louis Vuitton Toile mark was "inherently distinctive"); Burberry Ltd., 2009 WL 1675080, at *10-13 (concluding that Burberry's luxury markings were distinct).

### 3.  Louis Vuitton Exercises Exclusive Use of the Marks.

Louis Vuitton has set forth evidence that in 2009, it "initiated" 9,489 anti-counterfeiting raids and 26,843 anti-counterfeiting procedures.  (Solitro Dec. Ex. Q.)  In 2010, it sent 499 cease-and-desist letters in response to Customs Seizure Notices, after sending 217 such letters in 2009.  (Solitro Dec. Exs. R & S.)  Hyundai does not challenge this evidence.  (Def. 56.1 Resp. ¶ 87.)

Hyundai, however, contends that Louis Vuitton has permitted unlicensed, third-party uses of its marks.  It asserts that the Black Eyed Peas featured Louis Vuitton marks in the music video for "My Humps," and that musicians Dwight Yoakam and Jim Jones have featured the marks in their promotional material.  (Def. 56.1 ¶¶ 72-73.)  Louis Vuitton notes that it sent a cease-and-desist letter in response to the "My Humps" video,

and states that it was unaware of the other artists' uses until they were raised in a deposition.  (Pl. 56.1 Resp. ¶¶ 72, 73.)  Hyundai also asserts that, under a licensing agreement, Louis Vuitton permits the jewelry company Tiffany & Co. to manufacture and sell pendants resembling a Louis Vuitton mark, and that Louis Vuitton provides celebrities with its products for promotional purposes.  (Def. 56.1 ¶¶ 74-75; Pl. 56.1 Resp. ¶¶ 74-75.)

Viewing the evidence in a light most favorable to Hyundai, the record indicates that, at most, Louis Vuitton had two minor lapses in enforcement, when it was unaware that two musicians incorporated the company's marks in promotional materials.  Louis Vuitton responded to the "My Humps" video with a cease-and-desist letter, requires royalties for the Tiffany pendant, and consciously elects to provide its products to celebrities as a marketing strategy.  Additionally, Louis Vuitton also has submitted a record that reflects aggressive anti-counterfeiting measures.  Based on the record, Louis Vuitton has set forth evidence supporting its exclusive use of its marks, and Hyundai has failed to come forward with evidence that Louis Vuitton does not maintain exclusive use of its marks.

### 4.   The Louis Vuitton Mark Has a High Degree of Recognition.

Hyundai does not dispute that Louis Vuitton's marks "are widely recognized luxury marks."  (Pl. 56.1 ¶ 38; Def. 56.1 Resp. ¶ 38.)

### 5.   Hyundai Intended to Create an Association with Louis Vuitton.

The intent to associate with a famous mark weighs in favor of dilution.  Starbucks, 58 F.3d at 109.  Evidence of an intent to associate with the mark does not require evidence of bad faith.  Id.

As conceded by Hyundai's counsel, "The parties do not dispute that [Hyundai] intended to create an association with the [Louis Vuitton] Marks and the luxury they convey."  (Opp. Mem. at 15.)  Several deponents who worked on the "Luxury" ad testified that Hyundai and its outside advertising firms specifically intended to create an association with Louis Vuitton.  In the Rule 30(b)(6) deposition taken of Hyundai, Perry testified that the brown-and-gold colors were selected because they "are tied to Louis Vuitton" and that the "genericized" marks "remained very similar to the original Louis Vuitton marks."[4]  (Def. 56.1 Resp. ¶ 13.)  When asked whether he wanted to create an association with Louis Vuitton, Perry answered, "With luxury.  Yes."  (Pl. 56.1 ¶ 46; Def. 56.1 Resp. ¶ 46.)  Boone answered in the affirmative when asked whether the marks were designed to evoke "Louis Vuitton in particular."  (Def. 56.1 Resp. ¶ 16.)  When asked whether Hyundai "used Louis Vuitton[-]like marks in order to raise the image of the Hyundai brand in the mind of the consumer," Ewanick answered, "Correct."  (Pl. 56.1 ¶ 69; Def. 56.1 Resp. ¶ 69.)  Ewanick also testified, "I believe it was a brown basketball as you'd expect with some gold emblems on it to represent luxury definitely laddering and borrowing equity from Louis Vuitton."  (Pl. 56.1 ¶ 43; Def. 56.1 Resp. ¶ 43.)

In opposition to the motion, Hyundai notes that there is no dispute that Hyundai "intended to create an association with the [Louis Vuitton] Marks and the luxury they convey."  (Def. Opp. Mem. at 15.)  It asserts, however, that any such association was "expressive" in nature, and that the basketball design imperfectly copied the Louis

---

[4] In trademark law, the word "generic" may be used as a term of art that refers to a mark with a broad meaning over a range of products, and is therefore ineligible for trademark protection.  See, e.g., Harley-Davidson, Inc. v. Grottanelli, 164 F.3d 806, 810-11 (2d Cir. 1999) (discussing "hog" as generic term for motorcycles).  When the word "genericize" was used to describe the markings, I do not understand it to imply an effort to make the Louis Vuitton marks generic in this sense.

Vuitton marks, such that the Louis Vuitton marks could not be impaired as a matter of law.  (Def. Opp. Mem. at 15.)  As discussed below, the "Luxury" ad is not expressive in the sense that the word is used in trademark law, and Hyundai's argument about lack of impairment to the Louis Vuitton marks is ipse dixit not supported by citation to the record.

Louis Vuitton has come forward with evidence of an intent to associate by Hyundai, which Hyundai has admitted, subject to certain unsupported qualifications. This factor weighs in favor of Louis Vuitton.

> 6.  **Louis Vuitton Has Submitted Probative Evidence of Actual Association Between the Marks.**

The TDRA's sixth blurring factor weighs "[a]ny actual association between the mark or trade name and the famous mark."  15 U.S.C. § 1125(c)(2)(B)(vi).

To prove actual association, a plaintiff must establish that defendant's mark "conjure[s] an association with the senior [mark]," thereby "lessen[ing] the distinctiveness of the senior mark."  Nabisco, 191 F.3d at 218.   "[T]he absence of actual or even of a likelihood of confusion does not undermine evidence of trademark dilution." Starbucks, 588 F.3d at 109.  In Starbucks, the Second Circuit noted that the plaintiff submitted results of a telephone survey reflecting that 3.1% of respondents viewed Starbucks as the possible source of a coffee that called itself "Charbucks."  Id.  Overall, 30.5% of consumers said that Starbucks was "the first thing that comes to mind" upon hearing the word "Charbucks."  Id.  The Second Circuit concluded that the district court erred by concluding that no evidence supported a conclusion of "actual association," noting that the statute does not equate association with confusion.  Id. at 110 (citing Nabisco, 191 F.3d at 221 (the absence of confusion "has no probative value" in dilution

analysis)).  On remand, the district court concluded that the survey results "constitute evidence of actual association," but that because the survey did not present the marks in their full contexts and the surveys reflected relatively low levels of confusion, "the actual association factor weighs no more than minimally in Plaintiff's favor."  Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 2011 WL 6747431, at *4 (S.D.N.Y. Dec. 23, 2011).

In support of its assertion of actual association, Louis Vuitton cites the research of Hyundai's own expert, Dr. Jerry Wind.  From January 7 to 19, 2011, Wind conducted a double-blind survey using a test group that was shown the "Luxury" ad and a control group that was shown the same ad without the stylized basketball.  (Kruse Dec. Ex. cc at 3, 8.)  Participants were asked a series of questions about the ad.  (Kruse Dec. Ex. cc at 3.)  The study tested among the general population, and, separately, a subset of prospective Hyundai Sonata purchasers.  (Kruse Dec. Ex. cc at 4.)

When asked to identify the brands shown in "Luxury," 19% of Wind's test-group participants cited Louis Vuitton.  (Kruse Dec. Ex. cc at 13-14.)  Ninety percent of test-group petitioners said that they noticed the basketball, and 30% stated that the basketball reminded them of Louis Vuitton.  (Kruse Dec. Ex. cc at 30.)  Fifty-eight percent of the test group noticed "a pattern or design on the basketball."  (Kruse Dec. Ex. cc at 30.)  When asked to list which brand or product was advertised in the commercial, seventy-nine percent of the test group cited Hyundai first, and five percent mentioned Louis Vuitton first.[5]  (Kruse Dec. Ex. CC at 22, 40.)  None of the respondents said that it made them think less favorably of Louis Vuitton.  (Kruse Dec. Ex. cc at 13-14.)  Only two percent of respondents in the test group believed that Hyundai and Louis Vuitton

---

[5] Other participants believed that the commercial advertised non-specified car manufacturers, caviar, lobsters, basketballs, yachts, Spaulding, the police or chandeliers.  (Kruse Dec. Ex. cc at 23-24.)

were affiliated.  (Kruse Dec. Ex. cc at 18.)  Nine percent of the test-group respondents

said that the basketball made them more likely to buy a Hyundai Sonata.  (Kruse Dec. Ex.

cc at 35.)

        Louis Vuitton's expert, John R. Hauser, SC.D., conducted a double-blind

internet survey from April 9 to 17, 2011.  (Solitro Dec. Ex. C at 3, 5, 13-14.)  The survey

used both a control group and a test group, with the control group shown a video that

replaced the stylized "Luxury" basketball with a standard orange basketball.  (Solitro

Dec. Ex. C at 9-11, 18-19.)  Seventy-two percent of test-group participants noticed the

basketball design (compared to five percent of control-group respondents) and fifteen

percent of the test-group recognized the design as belonging to Louis Vuitton; twenty-

nine percent of all test-group respondents recognized it as some type of luxury mark.

(Solitro Dec. Ex. C at 8, 23-24.)  Hauser states that the fifteen-percent recognition is

consistent with the percentage of the buying public that is aware of the Louis Vuitton

mark.  (Solitro Dec. Ex. C at 25.)  Among those who recognized the design as Louis

Vuitton's, sixty-two percent believed that Louis Vuitton authorized Hyundai's use of the

mark.  (Solitro Dec. Ex. C at 9.)  Large percentages of both the test group and control

group interpreted the ad as promoting Hyundai's luxury qualities.  (Solitro Dec. Ex. C at

22-23.)

        Louis Vuitton also cites to messages that appeared on the social

networking site Twitter, which purport to show public responses to Louis Vuitton's role

in the "Luxury" ad.  For example, on February 14, 2010, during the weekend of the NBA

All-Star game, Twitter user kailanhindsman wrote, "I think a Louis vuitton football or

basketball would be gangsta."  (Kruse Dec. Ex. bb, at LOUV03476.)  That same day,

Dhat_Kid_DiCE wrote on Twitter, "Dyd yall See tht Louis Vuitton Basketball? Lols iWant 1 ^___^". (Kruse Dec. Ex. bb, at LOUV03474.)  By way of another example, MrExclusive1990 on Twitter wrote, "were they just playing ball with a LV basketball lol." (Kruse Dec. Ex. bb, at LOUV03469.)[6]

        Hyundai argues that Louis Vuitton has a "'conspicuous absence' of survey evidence," but plaintiff's record in support of summary judgment includes both its own expert's report, as well as the report of Hyundai's expert.  (Def. Mem. at 16.)  Hyundai also argues that the Wind survey indicates that "only" nineteen percent of unguided test-group participants recognized Louis Vuitton's appearance in the "Luxury" ad.  (Def. Mem. at 17.)  However, in light of the Starbucks opinions in both the Second Circuit and this District, the survey results present evidence of association.  588 F.3d at 109.  As also emphasized by Starbucks, Louis Vuitton is not required to prove actual consumer confusion, as in a trademark-infringement case.  588 F.3d at 109; 2011 WL 6747431, at *4.  The ultimate question in blurring is whether a famous mark's power has been whittled away by unauthorized use, or whether an association blurs the famous mark's distinctiveness.  Starbucks, 588 F.3d at 105; Tiffany (NJ), 600 F.3d at 111.  According to Louis Vuitton's expert, among those who recognized the Louis Vuitton mark, sixty-two percent believed the ad was approved by Louis Vuitton.  (Solitro Dec. Ex. C at 9.)  This is probative and relevant survey evidence that participants associated Louis Vuitton with Hyundai.  Moreover, the nineteen-percent figure emphasized by Hyundai also is relevant and probative evidence that participants associated Louis Vuitton with the "Luxury" ad.

---

[6] Louis Vuitton's memorandum of law and Local Rule 56.1 statement make generalized assertions that, in certain focus groups, the participants' oral responses reflect confusion about Louis Vuitton's role in the ad. (Pl. Mem. at 12: Pl. 56.1 ¶ 53.)  The precise nature of the focus group responses is not explained. Unhelpfully, Louis Vuitton has submitted hours-long, apparently unedited DVDs of these focus groups, which do not form a basis for this Court's decision.

Finally, while I afford limited weight to the Twitter postings, they provide some evidence of actual association.  Cf. New York City Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 319, 323 (S.D.N.Y. 2010) (e-mail from sophisticated consumer was probative of actual association).

Hyundai's evidence in opposition consists of the assertions that the focus group responses are unreliable.  As noted, the Court has not relied on the oral comments of the focus groups.  It also relies on one aspect of the Wind survey, which Hyundai itself commissioned, in which 19% of respondents cited the presence of Louis Vuitton's logo (Kruse Dec. Ex. cc at 13), a figure that Hyundai contends is too low to constitute evidence of actual association.  It is statistically significant that 19% of survey respondents, without prompting, identified Louis Vuitton as a brand shown in the ad, as is the 30% of participants who, when asked in Hyundai's survey to focus their attention on the basketball, said that it reminded them of Louis Vuitton.  (Kruse Dec. Ex. cc at 30.)

Louis Vuitton has come forward with evidence of actual association and Hyundai, in the face of that evidence, has failed to come forward with evidence that would permit a reasonable factfinder to conclude otherwise.

> 7.  Weighing the Six Statutory Factors, Louis Vuitton Has Set Forth Evidence in Its Favor on Each and Hyundai Has Not Come Forward with Relevant Evidence in Its Favor.

The plaintiff has come forward with evidence in support of each statutory factors at 15 U.S.C. § 1125(c)(2)(B).  The defendant has failed to come forward with evidence that, if believed, would enable a reasonable jury to find in its favor.

Hyundai has admitted that Louis Vuitton's marks are both distinct and well recognized.  15 U.S.C. § 1125(c)(2)(B)(ii) & (iv).  As previously noted, the greater a

mark's distinctiveness, the higher the degree of protection afforded under anti-dilution law.  Nabisco, 191 F.3d at 217.

Louis Vuitton also has set forth considerable evidence, including the statements of Hyundai's Rule 30(b)(6) witness, that Hyundai intended to create an association with Louis Vuitton – indeed, that the purpose behind the basketball design was to invoke just such an association.  15 U.S.C. § 1125(c)(2)(B)(v).

As to Louis Vuitton's exclusive use of the marks, Hyundai has offered evidence that two recording artists used Louis Vuitton marks in promotional images; Louis Vuitton asserted that it was unaware of those uses until they were cited in deposition.  By contrast, Louis Vuitton has set forth a record going toward aggressive enforcement of counterfeiting, and the other instances cited by Hyundai (the marks' appearance in the "My Humps" video and Tiffany's use of a Louis Vuitton mark) led to a cease-and-desist letter and a royalties agreement.  Louis Vuitton has set forth evidence supporting its exclusive use of its marks, and Hyundai has failed to come forward with evidence that Louis Vuitton did not maintain exclusive use of its marks.  15 U.S.C. § 1125(c)(2)(B)(iii).

As to the similarity between Louis Vuitton's marks and the designs on the basketball, they are virtually indistinguishable.  Viewed in context of the commercial, the brevity of the basketball's appearance, if anything, renders it more difficult to distinguish between the original Louis Vuitton marks and the minor variations made by Hyundai to "genericize" the marks.  Louis Vuitton also has set forth some evidence that it has maintained a limited, if ongoing, presence in niche sports and automobile products.  The degree of similarity between the marks is high.  15 U.S.C. § 1125(c)(2)(B)(i).

Lastly, Louis Vuitton has come forward with significant, probative evidence reflecting actual association between its famous marks and the stylized basketball in the "Luxury" ad. 15 U.S.C. § 1125(c)(2)(B)(vi). Each party's expert conducted surveys as to consumer perceptions of Louis Vuitton's role in the "Luxury" advertisement. When asked an open-ended question as to the brands identified in the ad, Hyundai's study concluded that 19% of respondents identified Louis Vuitton; Louis Vuitton's expert found a rate of 15%. When participants were asked to focus on the basketball, Hyundai's expert concluded that 30% of respondents associated the design with Louis Vuitton. Sixty-two percent of those familiar with the Louis Vuitton marks believed that Hyundai received permission to use them in the "Luxury" ad. Louis Vuitton also has submitted some evidence from social networking users that reflect interest and enthusiasm about a Louis Vuitton basketball. The record as to actual association with Louis Vuitton is substantial and unrebutted.

Viewed in its entirety, Louis Vuitton has set forth evidence that satisfies each of the TDRA's six blurring factors. It also bears emphasizing that these factors go toward the ultimate question of "whether an association, arising from the similarity of subject marks, 'impairs the distinctiveness of the famous mark.'" Starbucks, 588 F.3d at 109 (emphasis in original; quoting 15 U.S.C. § 1125(c)(2)(B)); see also Tiffany (NJ), 600 F.3d at 111 (blurring is "the whittling away" of a famous mark "through its unauthorized use by others."). The blurring inquiry does not require two companies to be in direct competition. TCPIP Holding Co., 244 F.3d at 95. Moreover, the text of the TDRA looks to whether "use of a mark or trade name in commerce is likely to cause dilution by blurring . . . ." 15 U.S.C. § 1125(c)(1) (emphasis added); see also V Secret Catalogue,

Inc. v. Moseley, 605 F.3d 382, 388 (6th Cir. 2010) ("The phrase 'likely to cause dilution' used in the new statute . . . significantly changes the meaning of the law from 'causes actual harm' under the preexisting law.").

Relying on Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d at 112, Hyundai argues that it cannot be liable under the TDRA because it did not use the Louis Vuitton marks to designate its own products – presumably, for instance, a hypothetical product such as the Louis Vuitton Sonata, or the actual sale of Louis Vuitton-style basketballs. (Def. Opp. Mem. at 11-12.)  Tiffany held that the online auction site eBay could not be liable for trademark dilution when it displayed the famous Tiffany mark "to advertise and identify the availability of authentic Tiffany merchandise on the eBay website."  600 F.3d at 112.  Tiffany also argued that eBay facilitated the sale of counterfeit Tiffany products, but the Second Circuit noted that eBay did not itself "sell the goods at issue."  Id.

By contrast, in this case, Louis Vuitton has set forth evidence that Hyundai utilized the Louis Vuitton marks for its own branding goals, and, in the minds of some consumers, created actual association between Hyundai and Louis Vuitton.  It did so without authorization from Louis Vuitton.  Unlike Tiffany, Hyundai, as the ad's creators testified, was "definitely laddering and borrowing equity from Louis Vuitton."  (Pl. 56.1 ¶ 43; Def. 56.1 Resp. ¶ 43.)  Hyundai argues that the dilution claim must fail because "[t]he pattern was not used to designate [Hyundai's] own goods, services, or business," (Def. Opp. Mem. at 11) but that argument conflates dilution with a false designation of origins claim under 15 U.S.C. § 1125(a).  Tiffany does not stand for the proposition that a viable blurring claim arises only when a mark designates an item's origins.

Louis Vuitton has come forward with substantial, probative evidence in its favor on each of the six factors of 15 U.S.C. § 1125(c)(2)(B), and that Hyundai has not come forward with evidence that would permit a reasonable juror to find in its favor. Louis Vuitton has established blurring under the TDRA as a matter of law.[7]

### 8.   Louis Vuitton Has Established Willfulness.

To be eligible for money damages under the TDRA, a defendant must have "willfully intended to trade on the recognition of the famous mark."  15 U.S.C. § 1125(c)(5)(B)(i).  A damages award is "subject to the discretion of the court and the principles of equity."  15 U.S.C. § 1125(c)(5).

As discussed, the record is replete with statements that Hyundai intentionally used the Louis Vuitton marks for purposes of promoting the Sonata.  (Def. 56.1 Resp. ¶¶ 13, 16, 43, 46, 69.)  Hyundai witnesses confirmed that the marks were intended to evoke "Louis Vuitton in particular" and that Hyundai used the marks "in order to raise the image of the Hyundai brand in the mind of the consumer[.]"  (Def. 56.1 Resp. ¶¶ 16, 69.)  When counsel asked Perry whether he "wanted to create an association with Louis Vuitton," Perry answered, "With luxury.  Yes."  (Pl. 56.1 ¶ 46; Def. 56.1 Resp. ¶ 46; emphasis added).  The basketball was designed to "represent luxury definitely laddering and borrowing equity from Louis Vuitton."  (Def. 56.1 Resp. ¶ 43.)

Moreover, the record reflects awareness on the part of Hyundai that it believed it needed permission to use other companies' luxury brands as part of the commercial, through evidence that Hyundai sought permission from numerous companies to use their marks in its campaign.  Hyundai sought out permission from

---

[7] Because I conclude that Louis Vuitton has satisfied its summary judgment burden on blurring, I need not reach the issue of dilution by tarnishment.  The Amended Complaint sets forth both dilution theories in a single count (see ¶¶ 37-46) and does not assert that separate damages arose based on tarnishment.

thirteen companies to use their brands, and six of them expressly declined.  (Pl. 56.1 ¶¶ 10, 65-66; Def. 56.1 Resp. ¶¶ 10, 65-66.)  Others, including Louis Vuitton, never responded to the request.  (Pl. 56.1 ¶ 11; Def. 56.1 Resp. ¶¶ 10, 11, 66.)  When no response came from Louis Vuitton, Hyundai nevertheless proceeded to use the "genericized" Louis Vuitton mark.

Even with Louis Vuitton's cease-and-desist letter in hand, Hyundai proceeded to run the ad through the NBA All-Star Weekend and, following commencement of this action, the Academy Awards.  (Pl. 56.1 ¶¶ 23, 29; Def. 56.1 Resp. ¶¶ 23, 29.)  According to Hyundai, its management "took the complaint under advisement, but ultimately determined there was no reason, legal or otherwise, not to run the Commercial as planned in the Academy Awards."  (Def. 56.1 ¶ 42; Pl. 56.1 Resp. ¶ 42.)  When asked at deposition whether the ad's quality "was more important a consideration than anything else you were aware of" in deciding to run it during the Academy Awards, Perry responded, "Yeah.  I mean, there was issues obviously.  The litigation was an issue.  It was a good ad."  (Def. 56.1 Resp. ¶ 23.)

The deliberate alteration to the Louis Vuitton marks also demonstrates a consciousness that Hyundai could not lawfully use the marks.  Perry confirmed in the Rule 30(b)(6) deposition that Louis Vuitton "genericized" the marks but ensured that "they remained very similar" to the Louis Vuitton design.  (Def. 56.1 Resp. ¶ 13.)  The coloring was "a distinctive special reference" to Louis Vuitton.  (Def. 56.1 Resp. ¶¶ 13, 16.)  Boone testified that the design was intended to evoke "Louis Vuitton in particular," but also that Hyundai's design "came out of somebody's imagination, so there was nobody to go seek permission from."  (Def. 56.1 Resp. ¶¶ 14, 16.)  Such testimony

reflects the conscious intent within Hyundai to ladder and borrow from the equity of Louis Vuitton marks while also circumventing any obligation to seek Louis Vuitton's permission

In opposition, Hyundai counters that it acted with an expressive intent, and that its willfulness should be decided by a jury.  (Def. Opp. Mem. at 22-23.)  The expressive intent of the ad is more appropriately directed to its fair use defense.  Plaintiff has come forward with substantial, probative evidence of Hyundai's willfulness, and Hyundai has not come forward with evidence that would permit a reasonable juror to find in its favor on willfulness.

### B.  Louis Vuitton Has Established Blurring Under New York Law

New York has adopted an anti-dilution law that is similar, but not identical to, the federal statute.  It states:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. L. § 360-*l*.[8]  New York law does not require a mark to be famous, and it "does not permit a dilution claim unless the marks are 'substantially' similar."  Tiffany, 600 F.3d at 111 (comparing New York and federal anti-dilution law); see also Biosafe-One, Inc. v. Hawks, 639 F. Supp. 2d 358, 367 (S.D.N.Y. 2009) (Chin, J.) (a plaintiff suing under the New York statute must prove "'(1) that it possess[es] a strong mark one

---

[8] Section 360-*l* speaks only of injunctive relief and is silent as to the availability of damages, although the Second Department has indicated that they may be awarded.  See Out of Box Promotions, LLC v. Koschitzki, 55 A.D.3d 575, 578 (2d Dep't 2008).  Neither party has addressed whether the statute provides for damages, and I need not resolve the issue at this time.

which has a distinctive quality or has acquired a secondary meaning such that the trade

name has become so associated in the public's mind with the [plaintiff] that it identifies

goods sold by that entity as distinguished from goods sold by others, and (2) a likelihood

of dilution by either blurring or tarnishment.'") (quoting Matter of Fireman's Ass'n of

State of N.Y. v. French Am. Sch. of N.Y., 41 A.D.3d 925, 928 (3d Dep't 2007) (internal

citations and quotations omitted)).  To determine dilution by blurring, New York dilution

law looks to "(i) the similarity of the marks; (ii) the similarity of the products covered;

(iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the

renown of the senior mark; and (vi) the renown of the junior mark."  New York Stock

Exchange, Inc. v. New York, New York Hotel LLC, 293 F.3d 550, 558 (2d Cir. 2002).

   Louis Vuitton argues that it has established points first, fourth and fifth in

support of its motion on the federal claim.  As to the similarities between the products

covered, it cites to its sale of sports-related items and its ties to the automobile industry.

(Pl. Mem. at 13-14.)  Louis Vuitton also argues that while its consumers are

sophisticated, because the basketball's markings are nearly identical to the Louis Vuitton

marks, the factor either is neutral or tips in Louis Vuitton's favor.  (Pl. Mem. at 14.)

Lastly, it argues that the renown of the junior mark is irrelevant here, because the

basketball was shown in a commercial and was not a product for sale.

   In opposition, Hyundai does not separately address the evidence as it

pertains to New York's dilution law.  It merely argues in a footnote that because Louis

Vuitton is not entitled to summary judgment on its federal dilution claim, it is not entitled

to summary judgment on its state-law claim.  (Def. Opp. Mem. at 18 n.22.)  It also argues

that there is not substantial similarity between the marks.  (Id.)  As previously discussed,

however, the Louis Vuitton marks are virtually indistinguishable from the design of the "Luxury" basketball.

  With no opposing evidence submitted by Hyundai other than that which it submitted on the federal blurring claim (as to which summary judgment is granted in plaintiff's favor) this Court concludes that factors first, fourth and fifth weigh in Louis Vuitton's favor.  Given that Louis Vuitton has periodically produced and marketed sports-related items, this Court concludes that the second factor weighs slightly in Louis Vuitton's favor.  The third and sixth factors are neutral.

  Based on the record, summary judgment is granted to plaintiff on its New York law claim for dilution by blurring.

C.  Hyundai Has Not Come Forward with Evidence That Would Permit a Jury to Find Fair Use Protection.

  1.  Overview of the TDRA's Text.

  "Statutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there."  Walters v. Industrial & Commercial Bank of China, Ltd., 651 F.3d 280, 290 (2d Cir. 2011) (quotation marks omitted).  An application of Hyundai's fair use defense must be grounded in the text of the TDRA, which states:

  (3) Exclusions

  The following shall not be actionable as dilution by blurring or dilution by tarnishment under this subsection:

  (A) Any fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own

goods or services, including use in connection with--

    (i) advertising or promotion that permits consumers to compare goods or services; or

    (ii) identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.

(B) All forms of news reporting and news commentary.

(C) Any noncommercial use of a mark.

15 U.S.C. § 1125(c)(3). Hyundai asserts that any use of the Louis Vuitton marks "include[ed] use in connection with . . . identifying, parodying, criticizing, or commenting upon the famous mark owner or the goods and services of the famous mark owner." Id. § 1125(c)(3)(A)(ii). Because "[a]ny noncommercial use of the mark" "shall not be actionable," id. § 1125(c)(3)(C), the text of the statute contemplates that fair use may apply in a commercial context.

    As Hyundai notes, "there is limited case law discussing the fair use exception of the TDRA." (Def. Opp. Mem. at 5 n.8.) In Starbucks, the Second Circuit first concluded that the Charbucks logo did not fall within the TDRA's fair-use framework because it designated the origins of goods, see 15 U.S.C. § 1125(c)(3)(A), but then considered whether its parodic qualities lessened the likelihood of blurring. 588 F.3d at 111-13. It concluded that because the Charbucks marks were, "at most, a subtle satire" of Starbucks, they did not qualify as a parody or "effect an 'increase [in] public identification [of the Starbucks Marks with Starbucks].'" Id. at 113 (alterations in

original; quoting Hormel Foods Corp. v. Jim Henson Productions, Inc., 73 F.3d 497, 506 (2d Cir. 1996)).

        2.   The Record Includes Express Evidence that Hyundai Intended No Parody, Criticism or Comment Upon Louis Vuitton.

        Through deposition testimony and in submissions by counsel, Hyundai has disclaimed any intention to parody, criticize or comment upon Louis Vuitton.  Rather, it contends that the basketball design in the "Luxury" ad reflects a broader social comment, one that embodies "an effort to challenge consumers to rethink what it means for a product to be luxurious."  (Def. Supplemental 56.1 ¶ 17.)

        The text of the TDRA expressly states that fair use applies if dilution has arisen due to "use in connection with . . . identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner."  15 U.S.C. § 1125(c)(3)(A)(ii) (emphasis added).  Because Hyundai has disclaimed any comment, criticism or parody of Louis Vuitton, the "Luxury" ad does not, as a matter of law, qualify for fair use under the TDRA.

        Louis Vuitton has directed the Court to deposition testimony in which individuals involved in the ad's creation state that the ad contains no comment on Louis Vuitton.  (Pl. 56.1 ¶¶ 71-72; Def. 56.1 Resp. ¶¶ 71-72.)  In the Rule 30(b)(6) deposition, Perry testified as follows:

        Q.  Okay.  Why didn't you just use the [un-altered] Louis Vuitton marks?
        A.  I don't recall the – Innocean came back to us and suggested adjustments.
        Q.  Well, why didn't you say, gee, to make the association even stronger, let's just use the Louis Vuitton marks?
        A.  The intent of the spot wasn't to – was to portray these over-the-top overwhelming luxury ideas.

Q.  Right.  And, in fact, you weren't commenting in any way or giving any commentary on Louis Vuitton, were you?

[Defense counsel]: Objection to the form.   You may answer.

A.  No.

Q.  And the point here was not to actually make fun of Louis Vuitton or criticize Louis Vuitton, was it?

[Defense counsel]: Objection to the form.

A.  That is correct.

Q.  So why not use the Louis Vuitton marks themselves?

[Defense counsel]: Asked and answered.  You may answer.

A.  I suppose we could have.  We opted not to.  It wasn't the intent to try to – the intent wasn't specific to – the same reason why we didn't use specific brands on any of the other things we did.  It was just to convey luxury.  And to your point that the brown and gold conveyed luxury.

Q.  The intent wasn't to say anything about Louis Vuitton, was it?

[Defense counsel]: Asked and answered.

A.  Correct.

(Kruse Dec. Ex. L at 142-44.)  Similarly, Perry testified that any commentary in the

"Luxury" ad was of a broad, societal nature, and not directed to any item or brand.  He

stated:

Q.  Well, were you trying to provide commentary on the specific things that are shown in the course of the commercial?

A.  No.

Q.  No.  You were – you were trying to give a kind of general social comment, correct?

A.  That's correct.

Q.  And am I correct that the individual scenes that you used within the course of the commercial, you could use one, you could use another.  It's just a matter of sort of decisions of which ones you liked best, right?

[Defense counsel]: Objection to the form of the question.  You may answer.

A.  Yes.

\*       \*       \*

> Q.  In fact, you could have – had you wanted to, you could have continued to do the ad and have it make sense without any additional basketball scene at all; isn't that true?
>
> A.  Yes.

(Kruse Dec. Ex. L at 129-30, 147.)

Boone, an account executive at the advertising firm that oversaw the "Luxury" ad, also testified that the ad contained no comment directed toward Louis Vuitton or its marks:

> Q.  So what other than Louis Vuitton were you attempting to have consumers take away from the basketball with these markings on it?
>
> A.  That was just one teeny, tiny piece of the commercial that was meant to signify luxury.  . . .  It was a 30-second commercial that in its totality at the end of watching that commercial they would say, oh, this commercial is about communicating that Hyundai is a vehicle that provides luxury to all, that we're bringing luxury – you don't have to spend gazillions of dollars to have luxury, that this car – it was about the car, about communicating the Hyundai product.   We weren't trying to at all promote Louis Vuitton.   That was not our objective.   We wanted to sell Hyundais through this over-arching communication about that you can get luxury at an affordable price, that was what we were trying to do.
>
> Q.  You weren't commenting on Louis Vuitton in any way, were you?
>
> [Defense counsel]:  Object to the form of the question.
>
> A.  Can you be more specific with your question?
>
> Q.  I'm just asking you were you attempting through the commercial to comment on Louis Vuitton?
>
> A.  No.
>
> Q.  I'm sorry?
>
> A.  No.
>
> Q.  Were you in some ways trying to criticize Louis Vuitton?

>A.  No.
>
>Q.  Were you in some ways trying to make fun of Louis Vuitton?
>
>A.  No.
>
>Q.  Were you in any way trying to compare the Hyundai with Louis Vuitton?
>
>A.  No.
>
>Q.  And it's your position that this wasn't about Louis Vuitton at all, this basketball, is that correct?
>
>A.  Correct.

(Kruse Dec. Ex. M. at 40-41, 43.)

In opposition to Louis Vuitton's motion, Hyundai does not direct the Court to evidence that contradicts this testimony.  It does not, for example, cite to testimony or other evidence in which other persons involved in the process explained an intention to parody or comment upon Louis Vuitton.  Indeed, in its memorandum of law, Hyundai does not even address this evidence.   Its opposition instead turns on discussion of legal authorities that do not apply the TDRA, with little engagement of the record cited by Louis Vuitton and minimal discussion of the statutory text.

Moreover, Hyundai's counsel states that the "Luxury" ad makes no comment on Louis Vuitton:  "The symbols of 'old' luxury, including the [Louis Vuitton] Marks, were used as part of the Commercial's humorous social commentary on the need to redefine luxury during a recession, even though the Commercial's overall intent was not to comment directly on [Louis Vuitton] or the other luxury symbols."  (Def. Supplemental 56.1 ¶ 17; emphasis added.)  It also states that "[a]lthough the Commercial was not intended as a direct attack on any of the luxury products shown, [Hyundai] used these items as part of a humorous social commentary on the current definition of luxury

itself, which was a contrast to the 'luxury for all' offered by the Sonata."  (Def. Supplemental 56.1 ¶ 2; emphasis added.)

> In its opposition brief, Hyundai's counsel also states:
>
>> Surely the Commercial could have been made by evoking a different designer's marks on the basketball (e.g., Gucci, Fendi, etc.).  Yet, some symbol of luxury had to be chosen to make the basketball an integral part of the basketball vignette; for commentary purposes, HMA chose LVM, the number one luxury brand in 2010.

(Def. Opp. Mem. at 7.)  Yet Hyundai does not suggest that Louis Vuitton or these other marks were the object of parody, comment or criticism, but instead that these brands were proxies for its broader observation about an "old" luxury that stands in contrast with the Sonata line.  They were not comment, criticism or parody "upon the famous mark owner or the goods or services of the famous mark owner."  15 U.S.C. § 1125(c)(3)(A)(ii).

Louis Vuitton has come forward with evidence that the "Luxury" ad is not a comment, criticism or parody of Louis Vuitton.  Hyundai has cited no evidence to the contrary.  In addition, even Hyundai's counsel states that "the Commercial's overall intent was not to comment directly on [Louis Vuitton] or the other luxury symbols," (Def. Supplemental 56.1 ¶ 17) but rather, to make a generalized statement that contrasts the Sonata with "old" luxury.

Based on this record, I conclude that no reasonable trier of fact could conclude that the Louis Vuitton-style marks shown in the "Luxury" ad could constitute "use in connection with . . . identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner."  15 U.S.C. § 1125(c)(3)(A)(ii).

3.   The Authorities Cited by the Parties Do Not Support Hyundai's Fair
Use Argument.

Hyundai's fair use argument is resolved by the text of the TDRA. Both

parties have, however, extensively briefed authority discussing fair use in other contexts.

Even if the statute's text did not resolve Hyundai's argument, the authority cited by

Hyundai would not support its claim to fair use. In discussing this authority, I am

mindful that several of the decisions arose from bench trials or preliminary injunction

motions, and therefore may be distinguishable. Certain other decisions explore fair use

under the Copyright Act, 17 U.S.C. § 107, the text of which varies from the fair-use

provision of the TDRA.

First, as under the TDRA, the Second Circuit previously concluded that to

apply trademark fair use, any comment or parody must be directed to the plaintiff's mark.

See, e.g., Harley-Davidson, 164 F.3d at 813 (the parody exception does not apply when

the purported parody "makes no comment" on the original mark, and "simply uses it

somewhat humorously to promote [its] own products and services . . . ."). As discussed,

Hyundai has stated that the "Luxury" ad makes no comment upon Louis Vuitton.

Second, and relatedly, courts have rejected fair-use arguments that assert a

use directed toward expansive social criticism, as opposed to a targeted comment or

parody of the original. Applying the Copyright Act, Rogers v. Koons, 960 F.2d 301, 310

(2d Cir. 1992), stated that absent a requirement that "the copied work must be, at least in

part, an object of the parody," "there would be no real limitation on the copier's use of

another's copyrighted work to make a statement on some aspect of society at large."

Third, the TDRA extends protection to "[a]ny noncommercial use of a

mark," while simultaneously protecting a use "identifying and parodying, criticizing, or

commenting upon the famous mark." 15 U.S.C. §§ 1125(c)(3)(A)(ii) & 1125(c)(3)(C).

As such, the TDRA contemplates the protection of parody, criticism or comment for

commercial use.  In other contexts, however, courts have concluded that the promotional

use of a senior mark weighs against fair use protections.  See, e.g., Harley-Davidson, 164

F.3d at 813; Deere & Company v. MTD Products, Inc., 41 F.3d 39, 44-45 (2d Cir. 1994)

(promotional ads are not "worthy purposes of expression," but done "simply to sell

products," a "purpose that can easily be achieved in other ways.").  Given that Hyundai

was "definitely laddering and borrowing equity from Louis Vuitton" (Pl. 56.1 ¶ 43; Def.

56.1 Resp. ¶ 43) and did so for the purpose of advertising the Sonata, under Second

Circuit authority pre-dating the TDRA, Hyundai's promotional purpose would weigh

against fair use protection.

         Fourth, in opposition to Louis Vuitton's motion and in support of its own

summary judgment motion, Hyundai heavily relies on authority that concluded, as a

matter of law, that a defendant's use of a mark constituted parody or comment.[9]  Courts

have, however, not applied fair use when the defendant's mark is instead "a subtle satire"

of the original.  Starbucks, 588 F.3d at 113.  The instances of parody that Hyundai cites

involve over-the-top, unmistakable parodies of an original.  See, e.g., Cliffs Notes, Inc. v.

Bantam Doubleday Dell Publishing Grp., Inc., 886 F.2d 490, 496-97 (2d Cir. 1989)

(variations in coloring, content and the labeling "a satire" alerted consumer of difference

between parody and original); Hormel Foods, 73 F.3d at 501, 503 (an "an unclean

'grotesque' boar" puppet bears no resemblance to luncheon meat, and "consumers are

likely to see the name 'Spa'am' as the joke it was intended to be."); Tommy Hilfiger

---

[9] "Parody or satire, as we understand it, is when one artist, for comic effect or social commentary, closely imitates the style of another artist and in so doing creates a new art work that makes ridiculous the style and expression of the original."  Rogers, 960 F.2d at 309-10.

<u>Licensing, Inc. v. Nature Labs, LLC</u>, 221 F. Supp. 2d 410, 422 (S.D.N.Y. 2002) (Mukasey, J.) (pet perfume called "Timmy Holedigger" was an "obvious parod[y]" of Tommy Hilfiger brand); <u>Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC</u>, 507 F.3d 252, 260-61 (4th Cir. 2007) (reciting "immediate[ ]" differences between dog chew toy and Louis Vuitton products). Even if Hyundai had not expressly disavowed comment, criticism or parody directed to Louis Vuitton, the cases identifying such clear-cut instances of fair use do not go toward the existence of triable issues of fact in the "Luxury" ad.

Therefore, even if Hyundai's fair use argument was not resolved by the text of the TDRA, the authorities extensively briefed by the parties would not support a different result.

## II.  HYUNDAI'S MOTION FOR SUMMARY JUDGMENT IS DENIED.

Hyundai has moved for summary judgment in its favor on all claims asserted by Louis Vuitton. In addition to its trademark dilution claims, Louis Vuitton asserts trademark infringement claims under 15 U.S.C. §§ 1125(a)(1)(A) & 1114(a), and common-law unfair competition under New York law. (Am. Compl. ¶¶ 55-77.) The elements of a federal trademark-infringement claim and a New York unfair competition claim are "almost indistinguishable," except that New York requires an additional element of bad faith. <u>Grout Shield Distribs., LLC v. Elio E. Salvo, Inc.</u>, __ F. Supp. 2d __, 2011 WL 5560296, at *11 n.15 (E.D.N.Y. Nov. 16, 2011) (citing <u>U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.</u>, 800 F. Supp. 2d 515 (S.D.N.Y. 2011)).

The Lanham Act provides for a trademark-infringement claim if unapproved use of a mark is likely to cause confusion as to affiliation, sponsorship, or

approval.  15 U.S.C. § 1125(a)(1)(A); see generally Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 204 (2d Cir. 1979) (reviewing infringement claim as it relates to affiliation, sponsorship or approval).  To a large extent, both parties' submissions have failed to focus on the key issue plaintiff's trademark infringement claims: Whether prospective purchasers of Hyundai Sonatas incorrectly perceived Louis Vuitton to have sponsored, associated or affiliated with Hyundai based on the "Luxury" ad.  See, e.g., Dallas Cowboys Cheerleaders, 604 F.2d at 204-05.  The evidence and theory of liability in this context is likely to be significantly different than in many trademark actions, where allegedly confusing marks are employed by head-to-head competitors, see, e.g., Starbucks, 588 F.3d at 114 & n.6, or even, as in Tommy Hilfiger, 221 F. Supp. 2d at 416-21, where the allegedly infringing mark is displayed on products available for purchase by the general public.  In its motion for summary judgment, Hyundai often strays from the issue of whether Hyundai Sonata consumers have made misinformed purchasing decisions based on Louis Vuitton's role in the "Luxury" ad, and instead focuses heavily on the ad's purportedly expressive nature and the protections that should be afforded to it.

        For the reasons explained, I conclude that Hyundai has not met the initial summary judgment burden of coming forward with facts that, if undisputed, would entitle it to judgment as a matter of law.  See Vt. Teddy Bear, 373 F.3d at 244.  In reviewing Hyundai's motion for summary judgment, I construe the record in the light most favorable to Louis Vuitton as the non-movant and draw all reasonable inferences in its favor.  Costello, 632 F.3d at 45.

A.  Weighing Consumer Confusion under *Polaroid*.

In Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961), Judge Friendly, writing for the panel, set forth eight factors to be considered in determining the likelihood of confusion.  They are: (1) the strength of the mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that the plaintiff will "bridge the gap" between the products; (5) evidence of actual consumer confusion; (6) whether the defendant acted with bad faith in adopting the mark; (7) the defendant's product quality; and (8) consumer sophistication.  A court is not "limited to consideration of only these factors."  Louis Vuitton Malletier, 454 F.3d at 118.  No single Polaroid factor is dispositive.  Nabisco, Inc. v. Warner Lambert Co., 220 F.3d 43, 46 (2d Cir. 2000).

1.  Strength of the Mark.

Hyundai asserts that Louis Vuitton's "undeniably strong" mark weighs against consumer confusion.  (Def. Mem. at 8.)  It relies on Yankee Publishing Inc. v. News America Publishing Inc., 809 F. Supp. 267, 271-73 (S.D.N.Y. 1992), in which, at the conclusion of a bench trial, Judge Leval observed that a strong mark lessens the likelihood of confusion when consumers encounter the mark as a clear joke – in that case, a cover of New York magazine issue that was a "very recognizable takeoff" on the Old Farmer's Almanac.  As previously discussed, however, the design of the "Luxury" basketball and the Louis Vuitton marks are not obviously different, and the "jest or commentary" reflected in the marks' use is less apparent than what Judge Leval found at the conclusion of a bench trial.  See also Starbucks, 588 F.3d at 116 (a mark's strength weighs against confusion only "in the limited circumstance where the defendants' mark is

a clear parody and there is widespread familiarity with the parody."). Moreover, Hyundai makes no citations to the record in support of this prong, but asserts, ipse dixit, that there is no confusion about the source of the Louis Vuitton marks in the "Luxury" ad. (Def. Mem. at 8.) This is insufficient to establish its entitlement to summary judgment. See Vt. Teddy Bear, 373 F.3d at 244.

Hyundai has not established that the undisputed strength of Louis Vuitton's mark weighs in Hyundai's favor.

## 2. Similarity of the Marks.

As previously discussed, the modified marks in the "Luxury" ad closely resemble the Louis Vuitton marks, a similarity made all the more difficult to distinguish by the ball's brief appearance in the commercial. Additionally, as noted, Louis Vuitton has submitted some evidence that it has produced sports items, include niche, high-end products. Based on this record, Hyundai has not established that the marks are dissimilar. This factor does not weigh in Hyundai's favor.

## 3. Competitive Proximity.

Based upon the record submitted by the parties, there is virtually no competitive proximity between Louis Vuitton's luxury consumer goods and Hyundai's automobiles. Even noting Louis Vuitton's association with high-end vehicles, as depicted in "Louis Vuitton: The Art of the Automobile," its role apparently has been limited to sponsorships of certain shows and awards that honor rare car models. Similarly, as discussed, Louis Vuitton has set forth evidence that it has sold certain sports products, but not that it has sold any basketball-related items.

Therefore, construing the evidence in a light most favorable to Louis Vuitton as the non-movant, I conclude that the competitive proximity of Hyundai's vehicles and Louis Vuitton's luxury products is minimal to non-existent, and that this factor weighs in Hyundai's favor.

### 4.   "Bridging the Gap."

"Bridging the gap refers to the senior user's interest in preserving avenues of expansion and entering into related fields."  Hormel Foods, 73 F.3d at 504 (quotation marks omitted).  There is no evidence that Louis Vuitton intends to further bridge the gap between luxury consumer goods and automobiles.  As Hyundai notes, Louis Vuitton has no marks registered for use in automobiles.  (Def. Opp. 56.1 ¶¶ 7-10.)  Counsel to Louis Vuitton states that certain other luxury brands, such as Gucci, have co-sponsored automobiles in recent years (Pl. 56.1 Resp. ¶ 90), but Louis Vuitton does not assert that it intends to do the same.  As to bridging the gap to sports-related items, as discussed, Louis Vuitton has had a limited presence in the production and sale of items such as golf bags and certain soccer-related products.  (Pl. 56.1 ¶ 61; Def. 56.1 Resp. ¶ 61.)  Louis Vuitton does not assert that it has an interest in further expanding to this market or entering into related fields.  See generally Hormel Foods, 73 F.3d at 504.  Similarly, there is no evidence that Hyundai intends to expand into products such as handbags.

Because Louis Vuitton has not come forward with evidence that it is likely to bridge the gap, this factor weighs in Hyundai's favor.

### 5.   Actual Confusion

"[E]vidence of actual confusion regarding affiliation or sponsorship is also entirely relevant to the ultimate likelihood-of-confusion inquiry."  Morningside

Group Ltd. v. Morningside Capital Group, LLC, 182 F.3d 133, 141 (2d Cir. 1999). "'The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.'" Starbucks, 588 F.3d at 114 (quoting Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 384 (2d Cir. 2005)).

       In Dallas Cowboys Cheerleaders, 604 F.2d at 204, the defendant, which owned an adult-movie theater, argued that there could be no instance of confusion as to whether an adult film "originated with" plaintiff Dallas Cowboys Cheerleaders, Inc. based on the film's display of marks highly similar to those used by the well known cheerleading squad. The Second Circuit stated that confusion was not limited to the film's origination, and instead could arise if the public believed that the plaintiff "sponsored or otherwise approved the use of the trademark" – in that case, a slightly altered version of a cheerleading uniform. Id. at 205. According to the Second Circuit, "the uniform depicted in 'Debbie Does Dallas' unquestionably brings to mind the Dallas Cowboys Cheerleaders. Indeed, it is hard to believe that anyone who had seen defendants' sexually depraved film could ever thereafter disassociate it from plaintiff's cheerleaders." Id.; [10] see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 872 (2d Cir. 1986) (discussing confusion as to whether consumers perceived the plaintiff to have consented to defendant's use of unique stitching pattern).

---

[10] In affirming the district court's conclusion of actual confusion, the court in Dallas Cowboys Cheerleaders did not rely on survey evidence or a record of consumer misimpressions so much as its own impression concerning the marks' similarity and the film's effect on the consuming public. Id. To some extent, it appears to have blended an analysis of actual confusion in the trademark infringement context with tarnishment in the dilution context. Id. (noting harm to reputation caused by likely association with adult film).

Thus, in this case, actual confusion is narrowly focused on the issue of whether prospective Hyundai Sonata consumers incorrectly perceived Louis Vuitton to have affiliated with, associated with or sponsored the Hyundai "Luxury" ad.

As discussed in Hyundai's dilution claim, various postings on Twitter misapprehended the authenticity of the Louis Vuitton-like basketball.  (Kruse Dec. Ex. bb.)  Other posts mentioned Louis Vuitton's apparent nexus with Hyundai.  A poster named rebelscholar wrote, "Did I just see a Louis Vuitton basketball in a Hyundai commercial???"  (Kruse Dec. Ex. bb at LOU03467.)  A post by syntheticgent stated, "That luxury hyndai sonata commercial is hard body.  LV basketball wit marble & gold backboard was so sick!"  (Kruse Dec. Ex. bb at LOU03470.)  Finally, superbetch10 stated, "in one of Hyundai's ad, there is a guy holding a basketball with the LV logo."  (Kruse Dec. Ex. bb at LOU03478.)  Certain other Twitter posts mentioned both brands, but did so in the context of remarking on this litigation, thereby reflecting an express awareness that Louis Vuitton had <u>not</u> sponsored or affiliated with the ad.[11]  While anecdotal and limited, the postings to Twitter reflect some actual confusion as to Louis Vuitton's role in the Hyundai ad, in the same fashion as letters or phone calls.  At the same time, Louis Vuitton's Rule 30(b)(6) witness testified that no consumer contacted Louis Vuitton about the commercial.[12]  (Def. 56.1 ¶¶ 57-58.)

The parties dispute the relevance and methodologies of one another's consumer surveys.  "To be probative and meaningful . . . surveys . . . must rely upon

---

[11] For instance, PurseBlog commented, "Anyone else notice the Hyundai commercial that LV is sueing them over is still airing?  The basketball does resemble LV much more on TV."  (Kruse Dec. Ex. bb at LOU03478.)

[12] Louis Vuitton again relies on the responses of certain focus groups, but as previously discussed, its Rule 56.1 Statement and related submissions have provided no basis to meaningfully weigh the focus group evidence, and the Court declines to independently review the apparently lengthy videos of the groups that are included in the record.

responses by potential consumers of the products in question." Universal City Studios, Inc. v. Nintendo Co., Ltd., 746 F.2d 112, 118 (2d Cir. 1984) (quotation marks omitted; ellipsis in original). When a senior user asserts that its mark has been unlawfully used by a defendant, the relevant survey universe is the prospective purchasers of the defendant's products. See Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 741 (2d Cir. 1994) (discussing varying universes of survey participants as determined by plaintiff's theory of liability). In this case, the relevant universe would consist of prospective Hyundai Sonata purchasers, and the relevant underlying issue is whether that population erroneously believed that Louis Vuitton sponsored, affiliated or associated with Hyundai. See id.

According to Hyundai's expert, a net eight percent of likely Hyundai Sonata consumers either believed that Hyundai and Louis Vuitton were affiliated in the "Luxury" ad, or that Louis Vuitton granted permission to use its marks. (Wind Dec. ¶ 9.) Ten percent stated that they were more likely to purchase a Honda Sonata as a result of the basketball in "Luxury." (Wind Dec. ¶ 10.) Hyundai asserts that these figures reflect an absence of actual confusion.

Louis Vuitton points out certain flaws in the Wind survey. They note that the basketball showed to the control group was a chestnut-brown color. Indeed, by depicting the ball in an atypical color that mimics the Louis Vuitton marks, a reasonable trier of fact may question the control's credibility. In addition, Wind asked participants, "In creating the commercial, do you think the company that produces the advertised brand or product [X] got or was required to get permission from any other company or brand?" As Louis Vuitton notes, the question is not only compound, but requires participants to draw a legal conclusion as to Hyundai's obligations. In Louis Vuitton

<u>Malletier, S.A. v. Dooney & Bourke, Inc.</u>, 340 F. Supp. 2d 415, 444-45 & 445 n.161 (S.D.N.Y. 2004), <u>vacated in part on other grounds</u>, 454 F.3d 108 (2d Cir. 2007), Judge Scheindlin concluded that a consumer-confusion study premised on a similar question "carr[ied] little weight," and cited other district courts that reached the same conclusion.[13]

To the extent that Louis Vuitton cites its own expert's opinions in opposition, that evidence is not directed to likely Hyundai Sonata purchasers and instead looks to the misapprehension among all participants who recognized the Louis Vuitton mark.  (Pl. Opp. Mem. at 19.)  While such views may be relevant in the dilution context – where the inquiry is directed toward perceptions of the senior mark and the whittling away of the senior mark's power – they carry little or no weight under the relevant survey universe as defined by <u>Sterling Drug</u>, 14 F.3d at 741, and do not shed light on the ultimate issue of whether prospective Hyundai purchasers mistakenly believed that Louis Vuitton sponsored, approved or affiliated with the "Luxury" ad.

For the reasons discussed, the Hyundai survey, while probative on association, contains flaws that are better assessed by a jury on the issue of actual confusion.  Louis Vuitton's arguably most probative evidence is a scattering of Twitter postings by unknown users, and the research of its own expert is not probative of actual confusion under Second Circuit authority.  On this record, neither party has submitted evidence that permits the Court to identify the presence or absence of actual confusion as a matter of law.

---

[13] There, the disputed survey asked respondents whether the defendant "needed to get permission or a license from the company whose bags were shown in the ad." 340 F. Supp. 2d at 444-45.

6.   Bad Faith.

The bad faith prong looks to "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." The Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955, 964 (2d Cir. 1996) (quotation marks omitted).  As previously noted, Ewanick stated that the basketball in the "Luxury" ad was intended "to represent luxury definitely laddering and borrowing equity from Louis Vuitton."  (Pl. 56.1 ¶ 43; Def. 56.1 Resp. ¶ 43.)  Several other witnesses testified that the basketball design was intended to closely resemble the Louis Vuitton marks.

As also noted, when Hyundai's advertising firm sought permission from thirteen luxury brands to use their marks in an advertisement, six expressly declined and the others, including Louis Vuitton, never responded.  (Pl. 56.1 ¶¶ 10, 65, 66; Def. 56.1 Resp. ¶¶ 10, 65, 66.)  This provides some evidence that Hyundai believed that it needed permission to use the Louis Vuitton mark, but elected to proceed with the stylized basketball anyway.

Lastly, when Louis Vuitton requested that Hyundai stop airing the ad, Hyundai elected to go forward with its planned broadcast, even after commencement of this litigation.  (Pl. 56.1 ¶¶ 20, 23, 27.)

In light of the foregoing, I conclude that Hyundai has not established as a matter of law that the bad-faith prong weighs in its favor.

7.   Product Quality.

As previously discussed, there is minimal competitive proximity between Louis Vuitton and Hyundai.  Louis Vuitton nevertheless contends that because of

divergent product quality, it is harmed by any confusion of its mark's association with Hyundai, noting that Hyundai "aspires" to be a luxury brand, but is not comparable to Louis Vuitton.  (Pl. Opp. Mem. at 21.)

Assuming the accuracy of Louis Vuitton's characterization of Hyundai, it is nevertheless the case that the dissimilarity between plaintiff's luxury consumer goods and defendant's automobiles are unlikely to cause confusion "because the products are not otherwise related as to makeup, usage, etc."  Hormel, 73 F.3d at 505.  I therefore agree with Hyundai's argument that this factor is irrelevant to determining consumer confusion.

8.  Consumer Sophistication

Given the expense of purchasing a new automobile and the market niche for Louis Vuitton's luxury products, the consumers of both Louis Vuitton products and Hyundai Sonatas are likely to be highly sophisticated and attentive to their respective purchases.  See, e.g., Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 399 (2d Cir. 1995) (detailed purchasing process for pneumatic staplers supports consumer sophistication); Louis Vuitton Malletier v. Dooney & Bourke, Inc., 561 F. Supp. 2d 368, 389 (S.D.N.Y. 2008) ("It cannot be reasonably disputed that consumers of products offered by . . . Louis Vuitton . . . are sophisticated and discerning.").

Based on this record, I cannot conclude, as a matter of law, that consumer sophistication weighs in favor of either party.  Because of the close similarity between the Louis Vuitton marks and the basketball design, a sophisticated consumer could plausibly conclude that the design in the "Luxury" ad originated with Louis Vuitton.  A

sophisticated consumer also could be more likely than others to distinguish between the marks.

Hyundai has not come forward with evidence that establishes this prong in its favor as a matter of law.

9.   Hyundai's First Amendment Arguments.

As noted, courts are not limited to the Polaroid factors when weighing the likelihood of consumer confusion.  Louis Vuitton Malletier, 454 F.3d at 118.  I briefly address Hyundai's First Amendment arguments as specifically directed to plaintiff's trademark-infringement and unfair-competition claims.

Similar to its argument asserting a fair use defense under the TDRA, Hyundai's motion for summary judgment on Louis Vuitton's trademark-infringement claim is interspersed with contentions as to the "Luxury" ad's expressive value and humorous intentions.  It contends that the ad's expressive value weighs in Hyundai's favor on points of the marks' strength, similarity of the marks and bad faith.  As previously noted, however, any comment in the "Luxury" ad is far more subtle than, for example, the parody that inheres in a Muppet depicting an unkempt boar, Hormel Foods, 73 F.3d at 503, or a pet perfume that directly pokes fun at a high-end fashion label, Tommy Hilfiger, 221 F. Supp. 2d at 415, 422.  Moreover, Hyundai has acknowledged that it intended to make no comment on the Louis Vuitton mark, but instead offered a broader social critique.  The Second Circuit has deemed such motivations unworthy of protection.  Rogers, 960 F.2d at 310.

Therefore, based on the record and the law of this Circuit, I conclude that any intended expression in the "Luxury" ad does not weigh in Hyundai's favor.

10. <u>Weighing the Factors.</u>

As noted, I conclude that the minimal competitive proximity and likelihood of bridging the gap weigh in favor of Hyundai. Hyundai also has established that any difference in product quality is not material to assessing consumer confusion. On the point of actual confusion, the evidence provided by both parties, while somewhat probative, is insufficient to determine as a matter of law whether this prong favors Hyundai. On all other <u>Polaroid</u> factors, Hyundai has failed to set forth evidence that entitle it to judgment in its favor as a matter of law.

The <u>Polaroid</u> factors guide a court in reaching the ultimate question of whether there is a likelihood of consumer confusion. <u>See</u>, <u>e.g.</u>, <u>Morningside Grp.</u>, 182 F.3d at 142 (good faith is not alone dispositive to the ultimate issue of consumer confusion); <u>Lee Myles Auto Grp., LLC v. Fiorello</u>, 2010 WL 3466687, at *3 (S.D.N.Y. Aug. 25, 2010) ("The <u>Polaroid</u> factors must be considered in the context of how each factor supports or undermines the ultimate issue of whether a consumer will be confused by the disputed marks."). They are not to be applied using "some rigid formula," and "[e]ach case" may "present[ ] its own peculiar circumstances." <u>Lois Sportswear</u>, 799 F.2d at 872. Hyundai has not made any effort to explain how a balancing of the factors should be applied in this case, and asserts only that because all factors should weigh in its favor, there is no likelihood of confusion, especially "against the backdrop of First Amendment principles." (Def. Mem. at 14.) It does not argue that the Court should place special emphasis on the lack of competitive proximity between Louis Vuitton or Hyundai, or emphasize the lack of evidence that Louis Vuitton intends to "bridge the gap" at some point in the future.

In balancing the <u>Polaroid</u> factors, I conclude that Hyundai has not established that it is entitled to judgment as a matter of law on Louis Vuitton's trademark infringement claims.  Hyundai's motion for summary judgment is therefore denied.

### B.   <u>Hyundai's Motion as to Damages is Denied.</u>

As noted, 15 U.S.C. § 1125(c)(5)(B)(i) allows for damages only if a defendant "willfully intended to trade on the recognition of the famous mark."

Hyundai argues that, even in the event that Louis Vuitton can establish willfulness, the record would not permit a reasonable juror to conclude "that even one" Sonata sale resulted from the stylized basketball in the "Luxury" ad.  (Def. Mem. at 23-25.)  Hyundai argues that the "Luxury" ad was "just a first step in a buying process," and that the evidence is too attenuated to attribute any sales to the ad.  (Def. Mem. at 23-24.)  In opposition, Louis Vuitton argues that "the simplest measure" of damages is for a jury to award it "the roughly $3.2 million" that Hyundai spent to produce and air the ad.  (Pl. Opp. Mem. at 23.)  Louis Vuitton also cites to the report of its damages expert, Laura Stamm, who has opined that the Louis Vuitton-like designs were "integral" to the "Luxury" ad, that the ad caused a spike in visits to Hyundai's website, and that "approximately $14.5 million" in profits "can be attributed to the dilutive and infringing advertisement . . . ."  (Shapiro Dec. Ex. 40 at 3, 4.)  Hyundai asserts that Stamm's conclusions are unreliable because they are extrapolations based on studies of year-long advertising campaigns that do not compare to the "Luxury" ad's limited run.  (Def. Mem. at 23 n.26.)  Based on the record and the parties' contentions, a finder of fact is best positioned to determine how much credit should be afforded to Stamm's research, or whether, as Hyundai contends, her views are "simply not plausible."  (Def. Mem. at 24.)

CONCLUSION

Louis Vuitton's motion for summary judgment in its favor on liability on

Counts I and II of the Amended Complaint is GRANTED.

Hyundai's motion for summary judgment is DENIED.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 22, 2012