**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LOUIS VUITTON MALLETIER, S.A.,

              Plaintiff,

    v.

HYUNDAI MOTOR AMERICA,

              Defendant.

No. 10 Civ. 1611 (PKC)

**CONFIDENTIAL**
**FILED UNDER SEAL**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**HYUNDAI MOTOR AMERICA'S MOTION FOR SUMMARY JUDGMENT**

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF FACTS ........................................................................2

ARGUMENT ....................................................................................3

I.   HMA'S USE OF MARKS EVOCATIVE OF THE LVM MARKS IS ENTITLED
     TO PROTECTION UNDER THE FIRST AMENDMENT ..............................4

     A.   Advertisements Can Contain Protected Expressive Communications ...................4

     B.   The Commercial Is In Part a Social Commentary Protected by Case Law
          Governing Parody and Other Expressive Devices.....................................5

     C.   Even Without Balancing First Amendment Concerns, the Commercial's
          Expressive Intent Is Relevant to LVM's Infringement and Dilution Claims .........6

II.  LVM CANNOT PROVE TRADEMARK INFRINGEMENT...........................7

     A.   The Strength of the LVM Marks Cuts Against Confusion in an Expressive
          Communication..............................................................8

     B.   HMA's Expressive Intent and the Contextual Differences Between the
          Marks Undermine a Finding of Similarity..............................................8

     C.   LVM and HMA Do Not Compete ......................................................9

     D.   LVM Has No Intention of Expanding into the Automotive Field ........................10

     E.   There Is No Evidence of Actual Consumer Confusion .........................10

     F.   There Is No Evidence of Bad Faith.....................................................11

     G.   The Respective Quality of the Products Is Unlikely To Cause Confusion
          Where They Occupy Unrelated Markets ...............................................13

     H.   The Parties' Consumers Are Sophisticated............................................14

     I.   A Balancing of the *Polaroid* Factors Shows No Likelihood of Confusion ...........14

III. HMA IS ENTITLED TO JUDGMENT ON LVM'S DILUTION CLAIMS ...................14

     A.   The Commercial Is Protected by the Fair Use Defense .........................15

i

B.    LVM Cannot Prove a Likelihood of Blurring.........................................................15

      1.    The Marks Are Not Similar ......................................................................16

      2.    LVM Is Not Engaged in Substantially Exclusive Use of Its Marks ..........17

      3.    Hyundai Intentionally Associated with LVM To Advance the Commercial's Expressive Message ...........................................................17

      4.    There is No Actual Association That Blurred the Distinctiveness of the LVM Marks........................................................................................18

C.    LVM Cannot Prove a Likelihood of Tarnishment .................................................20

IV.    HMA IS ENTITLED TO SUMMARY JUDGMENT ON LVM'S CLAIM FOR HMA'S PROFITS.................................................................................................................22

CONCLUSION.............................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................................4

*Arrow Fastener Co., Inc. v. Stanley Works*,
59 F.3d 384 (2d Cir. 1995)..............................................................................8, 9, 14

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983)...................................................................................................4

*Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*,
360 F.3d 125 (2d Cir. 2004).....................................................................................7

*Burck v. Mars, Inc.*,
571 F. Supp. 2d 446 (S.D.N.Y. 2008).......................................................................4

*Charles Atlas, Ltd. v. DC Comics, Inc.*,
112 F. Supp. 2d 330 (S.D.N.Y. 2000).............................................................. passim

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*,
886 F.2d 490 (2d Cir. 1989)...........................................................................5, 6, 8

*Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*,
125 F.3d 28 (2d Cir. 1997)......................................................................................12

*Deere & Co. v. MTD Prods., Inc.*,
41 F.3d 39 (2d Cir. 1994) ...........................................................................5, 21, 22

*eBay, Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)...............................................................................................22

*GMA Accessories, Inc. v. BOP, LLC*,
765 F. Supp. 2d 457 (S.D.N.Y. 2011).......................................................................7

*GTFM, LLC v. Universal Studios, Inc.*,
No. 02 CV. 0506, 2006 WL 1377048 (S.D.N.Y. May 16, 2006) ...........................10

*George Basch Co. v. Blue Coral, Inc.*,
968 F.2d 1532 (2d Cir. 1992)......................................................................22, 23, 24

*GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*,
769 F. Supp. 2d 630 (S.D.N.Y. 2011).....................................................................14

*Gottlieb Dev. LLC v. Paramount Pictures Corp.*,
590 F. Supp. 2d 625 (S.D.N.Y. 2008)......................................................................12

*Gruner + Jahr USA Publ'g v. Meredith Corp.*,
991 F.2d 1072 (2d Cir. 1993)....................................................................................7

iii

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
  73 F.3d 497 (2d Cir. 1996)..................................................................... passim

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.*,
  828 F.2d 1482 (10th Cir. 1987) ............................................................19, 20

*L & L Wings, Inc. v. Marco-Destin Inc.*,
  756 F. Supp. 2d 359 (S.D.N.Y. 2010)..........................................................24

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  561 F. Supp. 2d 368 (S.D.N.Y. 2008) ................................................. passim

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
  507 F.3d 252 (4th Cir. 2007) ............................................................... passim

*M & G Elecs. Sales Corp. v. Sony Kabushiki Kaisha*,
  250 F. Supp. 2d 91 (E.D.N.Y. 2003) ...........................................................18

*Miss Universe, L.P. v. Villegas*,
  672 F. Supp. 2d 575 (S.D.N.Y. 2009) ...........................................................18

*Moseley v. V Secret Catalogue, Inc.*,
  537 U.S. 418 (2003)..................................................................................15, 20

*N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel, LLC*,
  293 F.3d 550 (2d Cir. 2002).............................................................7, 11, 12

*Nike, Inc. v. Nikepal Int'l, Inc.*,
  No. 2:05-cv-1468, 2007 WL 2782030 (E.D. Cal. Sept. 18, 2007) .........................19

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*,
  590 F. Supp. 2d 500 (S.D.N.Y. 2008)...................................................4, 9, 13

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
  86 F. Supp. 2d 305 (S.D.N.Y. 2000)............................................................11

*Pfizer Inc. v. Sachs*,
  652 F. Supp. 2d 512 (S.D.N.Y. 2009) ...........................................................21

*Pharmacia Corp. v. Alcon Labs., Inc.*,
  201 F. Supp. 2d 335 (D.N.J. 2002)...............................................................19

*Playtex Prods., Inc. v. Georgia-Pacific, Inc.*,
  390 F.3d 158 (2d Cir. 2004)..................................................................4, 9, 20

*Polaroid Corp. v. Polorad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961).........................................................................7

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
  No. 09 Civ. 9476, 2011 WL 1842980 (S.D.N.Y. May 13, 2011).........................22

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989).........................................................................4

iv

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010) ................................................................................22

*Savin Corp. v. Savin Group*,
   391 F.3d 439 (2d Cir. 2004) .......................................................................10, 13

*Sports Auth., Inc. v. Prime Hospitality Corp.*,
   89 F.3d 955 (2d Cir. 1996) .................................................................................14

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
   588 F.3d 97 (2d Cir. 2009) ........................................................................ passim

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*,
   221 F. Supp. 2d 410 (S.D.N.Y. 2002) ......................................................... passim

*Visa Int'l Serv. Ass'n v. JSL Corp.*,
   610 F.3d 1088 (9th Cir. 2010) ...........................................................................19

*WAWA Dairy Farms v. Haaf*,
   No. 96-4313, 1996 WL 460083 (E.D. Pa. Aug. 7, 1996) ...................................19

*Yankee Publ'g Inc. v. News Am. Publ'g Inc.*,
   809 F. Supp. 267 (S.D.N.Y. 1992) .......................................................5, 8, 15, 20

## Statutes and Rules

15 U.S.C. § 1114 ...........................................................................................................7

15 U.S.C. § 1125 .................................................................................................. passim

N.Y. Gen. Bus. Law § 360-*l* ...............................................................................15, 20

Fed. R. Civ. P. 56 ........................................................................................................3

## Other Authorities

152 Cong. Rec. S1921 (daily ed. Mar. 8, 2006) .......................................................15

H.R. Rep. No. 109-23 (2005) ....................................................................................16

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*,
   § 23:113 (4th ed. 2011) ....................................................................................11

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*,
   § 24:117 (4th ed. 2011) ....................................................................................16

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*,
   § 32:159 (4th ed. 2011) ....................................................................................11

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*,
   § 32:161 (4th ed. 2011) ....................................................................................11

Defendant Hyundai Motor America ("Hyundai" or "HMA") submits this Memorandum of Law in support of its Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This is a case in which the dispositive evidence can literally be seen in 30 seconds: the half-minute commercial at issue clearly shows an expressive message from which no reasonable jury could find any possible likelihood of confusion, blurring, or tarnishment.  Yet, Plaintiff Louis Vuitton Malletier, S.A. ("LVM") brings this trademark infringement and dilution action against HMA on the basis of the commercial's intentionally fanciful depiction, for all of one second, of a pattern evocative of its trademark.  The commercial aired during the Super Bowl, reserved for advertisers' most creative and expressive messages, and employed the challenged pattern on a basketball in a make-believe game as part of a humorous commentary on the excesses of "luxury" items that offer no intrinsic value—just a steep price tag.  This expressive use is protected from LVM's claims here by the First Amendment, among other things.  Given the nature of the commercial, no amount of artful argument, misdirection, or wordsmithing can obscure the fact that it cannot—and does not—violate LVM's claimed rights.

Notwithstanding the commercial's clearly expressive message, LVM has doggedly persisted in this action despite having no evidence of even one consumer who has been confused, mistaken, or deceived about an affiliation or relationship between HMA and LVM.  Both parties' expert surveys yielded confusion levels of no more than 9%—a *de minimis* level which is probative of a *lack* of confusion.  LVM tellingly chose not to even survey for dilution, and HMA's survey results do not show an actionable level of association or any tarnishment of the LVM brand.

1

Despite the paucity of evidence supporting LVM's claims, LVM brazenly seeks to disgorge HMA's profits stemming from the one-second use of the challenged pattern. This damages theory is unfounded because LVM has not presented the requisite evidence that HMA acted willfully to deceive consumers or to dilute LVM's marks. LVM clings to HMA's failure to obtain its permission as evidence of bad faith, but this fact alone cannot suffice, otherwise virtually every unauthorized, third-party use of trademarks would result in liability. Nor could a jury, after viewing the commercial, reasonably conclude that even one consumer purchased a Hyundai Sonata (the advertised product) solely because of the one-second snapshot of the patterned basketball during a 30-second commercial that aired merely five times. Given that the record is undisputed without any factual issues to be tried, this entire case can and should be resolved as a matter of law in HMA's favor.

## STATEMENT OF FACTS[1]

During the worst recession in recent decades, HMA and its advertising agency, Innocean Worldwide Americas ("Innocean"), created several commercials to launch HMA's redesigned mid-size Sonata sedan, which were to air during the 2010 Super Bowl. (SOF ¶ 12.) One of these commercials was "Luxury" (the "Commercial"), a humorous, socio-economic commentary on luxury defined by a premium price tag, rather than by the value to the consumer. (*Id.* ¶ 14.) The director of the Commercial described it as "a comment on solidity-as-luxury . . . a simple, artful collision between the very rich . . . and the rest of us, between gaudy American money . . . and real life in America." (*Id.* ¶ 24.) To drive home this proposition, the Commercial juxtaposed well-known symbols of luxury with everyday situations, or, as it was described at the

---

[1]   The undisputed facts are set forth more fully in the accompanying Statement Pursuant to Local Rule 56.1 in Support of Defendant's Motion for Summary Judgment, dated July 22, 2011 ("SOF"), the Declarations of Jeff Spiegel, Dr. Jacob Jacoby, and Dr. Yoram (Jerry) Wind, dated July 20, 2011, and the Declaration of Julie B. Shapiro, dated July 21, 2011.

time, "injections of the absurd into the everyday." (*Id.* ¶¶ 16, 24.)  In keeping with the  tradition of Super Bowl advertisements, the Commercial was a creative storytelling piece designed to develop consideration of the brand, which is many steps removed from a negotiation at an automobile showroom.  (*Id.* ¶¶ 12, 45.)

The Commercial's humorous vignettes, all appearing in a 30-second window, included policemen eating caviar in a patrol car, large yachts parked beside modest homes, and a four-second scene of an inner-city basketball game played on a lavish marble court with a gold hoop. (*Id.* ¶ 16.)  For approximately one second, a basketball appeared with a surface pattern that is suggestive of, but not identical to, LVM's well-known monogram (the "LVM Marks").  (*Id.* ¶ 17.)  The final ten seconds show the Sonata driving down a street lined with chandeliers and red-carpet crosswalks.  (*Id.* ¶ 16.)  The narrator asks, "What if we made luxury available to everyone?  Would it still be called luxury?  Or maybe we'd need a new word for it.  Oh, here's one.  Hyundai.  The all-new Hyundai Sonata."  (*Id.* ¶ 15.)  The Commercial ends with the Hyundai trademark.  (*Id.* ¶ 16. )

The Commercial aired five times, including during the 2010 Super Bowl post-game show on February 7, 2010, three times during the NBA All-Star weekend of February 12-14, 2010, and during the 2010 Academy Awards on March 7, 2010.  (*Id.* ¶¶ 35, 36, 43.)

## ARGUMENT

HMA seeks summary judgment in its favor on all counts in the Amended Complaint on the ground that there are no genuine issues of material fact for trial.  *See* Fed. R. Civ. P. 56. HMA assumes the Court's familiarity with the standards applicable to summary judgment.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  Summary judgment is routinely granted on claims of trademark infringement, trademark dilution, and unfair competition.[2]

## I.   HMA'S USE OF MARKS EVOCATIVE OF THE LVM MARKS IS ENTITLED TO PROTECTION UNDER THE FIRST AMENDMENT

On its face, the Commercial is an expressive communication entitled to First Amendment protection, because it is not a mere sales pitch but also comments on broader issues.

### A.   Advertisements Can Contain Protected Expressive Communications

The Supreme Court has recognized that even *purely commercial* speech is "entitled to . . . qualified but nonetheless substantial protection."  *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68 (1983).  And this Circuit, in *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989), recognized the First Amendment implications of "hybrid" communications that "combin[e] artistic expression and commercial promotion" in such a way that the two "are inextricably intertwined."  Here, the Commercial "inextricably intertwine[s]" artistic and commercial elements, presenting a fanciful world in which well-known symbols of luxury are juxtaposed against everyday situations as part of a humorous commentary designed to make consumers think about the current definition of "luxury."  *See Burck v. Mars, Inc.*, 571 F. Supp. 2d 446, 457 (S.D.N.Y. 2008) (noting that "the commercial aspect of [the advertisements] is subtle . . . while the entertainment aspect is obvious").  Though it presents a product for consideration, it does not expressly propose a commercial transaction.[3]

---

[2]    *See, e.g., Playtex Prods., Inc. v. Georgia-Pacific, Inc.*, 390 F.3d 158 (2d Cir. 2004); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368 (S.D.N.Y. 2008); *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500 (S.D.N.Y. 2008); *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410 (S.D.N.Y. 2002); *Charles Atlas, Ltd. v. DC Comics, Inc.*, 112 F. Supp. 2d 330 (S.D.N.Y. 2000).

[3]    The Commercial never mentions price—as it would need to if it were to be classified as a mere offer of sale—and it emphasizes the social commentary at the end by superimposing on the screen the words "Think about it."  (SOF ¶ 15.)

Importantly, the complained-of design obviously is not used to represent that a designer is actually making basketballs for sale to the public. Rather, it is a minor part of the movie-like, tongue-in-cheek vignettes used to tell the Commercial's fanciful story. *Cf. Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 261 (4th Cir. 2007) (design actually used for product identification); *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 415-16 (S.D.N.Y. 2002) (same). Thus, the Commercial is subject to the balancing test set forth in *Rogers*, which "takes into account the ultimate test in trademark law, namely, the likelihood of confusion as to the source of the goods in question," but "allows greater latitude for works such as parodies, in which expression, and not commercial exploitation of another's trademark, is the primary intent." *See Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*, 886 F.2d 490, 495 (2d Cir. 1989) (quotations and citations omitted); *see also Tommy Hilfiger*, 221 F. Supp. 2d at 414.

**B.    The Commercial Is In Part a Social Commentary Protected by Case Law Governing Parody and Other Expressive Devices**

Courts in this Circuit have made clear that "use of a trademark in communicating an expressive or editorial message generally[] is accorded First Amendment deference." *Charles Atlas, Ltd. v. DC Comics, Inc.*, 112 F. Supp. 2d 330, 337 n.10 (S.D.N.Y. 2000) (citation omitted). This is so regardless of whether the communication is categorized as "comedy, parody, allusion, criticism, news reporting [or] commentary." *Id.* at 335 (citation omitted); *see also Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 44-45 (2d Cir. 1994) (noting importance of "maintaining broad opportunities for expression" in the context of satire, parody, social commentary, and "humorous ads for noncompeting products"); *Tommy Hilfiger*, 221 F. Supp. 2d at 415 (noting that puns and "comical expression[s]" are protected expression); *Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F. Supp. 267, 278-79 (S.D.N.Y. 1992) (holding use of mark "as part of a socio-economic

commentary" regarding a possible shift to thriftiness during a recession was protected).  The key to the First Amendment inquiry is simply "whether defendant used the mark for an expressive purpose, or to create an incorrect association in order to confuse the public."  *Charles Atlas*, 112 F. Supp. 2d at 337.

Here, the Commercial is obviously not a mere sales pitch.  Although its ultimate goal undoubtedly is to raise awareness of a commercial product, it does so through an overarching social commentary that we should rethink how we value items, particularly during a difficult recession.  (SOF ¶ 13.)  The Commercial uses a pattern evocative of the LVM Marks not to confuse, but to further this expressive message, in part by "pok[ing] fun at its subject."  (*Id.* ¶ 28.)  *See Cliffs Notes*, 886 F.2d at 496.[4]  Given this expressive intent, the First Amendment applies.

###  C.  Even Without Balancing First Amendment Concerns, the Commercial's Expressive Intent Is Relevant to LVM's Infringement and Dilution Claims

Even were this Court to find a First Amendment defense inapplicable, the nature of HMA's social commentary must be carefully considered against LVM's strained trademark infringement and dilution claims.  *See Tommy Hilfiger*, 221 F. Supp. 2d at 415-16 (holding First Amendment defense inapplicable because defendant put mark on its product for "source identification," but that "even without recourse to the First Amendment, [defendant's] comical adaptation is still relevant to the extent that the joke is clear enough to result in no confusion

---

[4]  "One can readily see why high-end fashion brands would be ripe targets for such mockery . . . ."  *Tommy Hilfiger*, 221 F. Supp. 2d at 415; *see Haute Diggity Dog*, 507 F.3d at 261 (holding that a "Chewy Vuiton" dog chew toy "is a comment on the rich and famous, on the LOUIS VUITTON name and related marks, and on conspicuous consumption in general").

under the statutory likelihood of confusion analysis"); *see also Haute Diggity Dog*, 507 F.3d at 267 (holding parodic nature of usage bears on ultimate dilution issue).[5]

## II.     LVM CANNOT PROVE TRADEMARK INFRINGEMENT

To prevail on claims for trademark infringement and unfair competition under Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) & 1125(a), "a plaintiff must show a probability, not just a possibility, of confusion," *N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel, LLC*, 293 F.3d 550, 554 (2d Cir. 2002) (citation omitted), and that "*numerous* ordinary prudent purchasers are likely to be misled or confused." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993).[6]  In assessing "likelihood of confusion," the court considers the eight well-known factors set forth in *Polaroid Corp. v. Polorad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  "No single factor is dispositive, and these factors are non-exclusive of other considerations a court may take into account."  *GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 466 (S.D.N.Y. 2011) (citing *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 130 (2d Cir. 2004)).  Application of these factors to the undisputed facts here shows that HMA is entitled to judgment as a matter of law on LVM's infringement and unfair competition claims.

---

[5]   This case is easier to resolve than both *Haute Diggity Dog* and *Tommy Hilfiger*.  In those cases, the defendants' trademarks, Chewy Vuiton and Timmy Holedigger respectively, contained the message also, thus making it far more difficult to separate the "sales pitch" or brand identification function from the protected message.  Not so here.  Hyundai obviously has not branded Sonatas themselves with LVM-like marks but rather has merely alluded to the LVM Marks in the course of delivering a  message about luxury.

[6]   To prevail on an unfair competition claim under New York law, a plaintiff must prove these elements and that the defendant acted in bad faith.  *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 381 & n.91 (S.D.N.Y. 2008).

### A.    The Strength of the LVM Marks Cuts Against Confusion in an Expressive Communication

The LVM Marks are undeniably strong, which ordinarily would weigh in favor of confusion, but "[w]here the plaintiff's mark is being used as part of a jest or commentary, the opposite can be true." *Yankee Publ'g*, 809 F. Supp. at 273.  In these instances, "because both plaintiffs' and defendant's marks are strong, well recognized, and clearly associated in the consumers' mind with a particular distinct ethic[,] . . . confusion is avoided." *Id.*  Indeed, as here, the success of the message "depends on a lack of confusion to make its point." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 503 (2d Cir. 1996).  The pattern on the basketball simply would not be funny if consumers did not recognize the LVM Marks (or at least the mark of some well-known fashion brand, if not LVM).  This factor cuts against a finding of consumer confusion.

### B.    HMA's Expressive Intent and the Contextual Differences Between the Marks Undermine a Finding of Similarity

On the factor of similarity of the marks, courts must not lose sight of the ultimate question of confusion.  *See Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 394 (2d Cir. 1995) (citation omitted).  Here, the expressive intent of the Commercial becomes especially relevant, as a protected use is "entitled 'at least' to conjure up the original and can do more." *See Cliffs Notes*, 886 F.2d at 495 (citation omitted); *see also Yankee Publ'g*, 809 F. Supp. at 274 (finding no likelihood of confusion "by reason of the consumer recognition that the allusion to the [plaintiff's mark] is a joke and not a source identifier").  Here, the basketball's pattern was similar, but not identical, to the LVM Marks—in modifying the marks, the Commercial evoked enough of the LVM Marks to make its point but also endeavored to alter the pattern to avoid using the *actual* LVM Marks.  (SOF ¶¶ 28-29.)

Moreover, the overall context in which the challenged pattern appears eliminates any finding of confusion. *See Arrow Fastener*, 59 F.3d at 394 (noting that courts must consider "context in which the respective marks are generally presented") (quotation and citation omitted); *Hormel Foods*, 73 F.3d at 503-04 (same); *Tommy Hilfiger*, 221 F. Supp. 2d at 417 (same). The pattern appears **on a basketball** and thus is not confusingly similar to the LVM Marks on high-end, luxury handbags. (SOF ¶ 53.) The basketball appears for merely one second within a 30-second commercial filled with over-the-top scenes in which other luxury items appear in contextually absurd situations (e.g., large yachts parked beside modest homes). (*Id.* ¶¶ 16-17.) In juxtaposition, HMA's Sonata, HMA's well-known stylized "H" trademark, the voiceover referencing the "all-new Hyundai Sonata," and the superimposed terms "Sonata" and "Hyundai," appear for ten seconds (*Id.* ¶¶ 15-16), which further "'weigh[s] against a finding of confusing similarity.'" *See O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 522 (S.D.N.Y. 2008) (quoting *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 164 (2d Cir. 2004)); *Charles Atlas*, 112 F. Supp. 2d at 341 (citing *Hormel Foods*, 73 F.3d at 503). The marks therefore are not confusingly similar.

### C.      LVM and HMA Do Not Compete

HMA and LVM indisputably occupy "distinct merchandising markets," which weighs against confusion. (SOF ¶ 54.) *Charles Atlas*, 112 F. Supp. 2d at 339 (quotation and citation omitted) (body building courses vs. comic books); *see also Hormel Foods*, 73 F.3d at 504 (SPAM vs. Muppet movie). The presence or absence of competition is paramount. *See Tommy Hilfiger*, 221 F. Supp. 2d at 418 ("[C]ourts are most vigilant to guard against a likelihood of confusion when the plaintiff and defendant use their marks on directly competing products."). Weighing further against confusion here is the fact that the challenged mark is used not as a source identifier for HMA's product but as part of a humorous depiction of a fictional product.

9

*See GTFM, LLC v. Universal Studios, Inc.*, No. 02 CV. 0506, 2006 WL 1377048, at *2 & n.6 (S.D.N.Y. May 16, 2006) (finding no confusion between FUBU-branded clothing and fictional "BUFU" clothing in movie).[7]  This factor thus weighs in HMA's favor.

### D.      LVM Has No Intention of Expanding into the Automotive Field

There is no evidence that LVM intends to "bridge the gap" between handbags and cars or sporting goods.  None of the registrations of the LVM Marks pertain to use of the marks in connection with automobiles or sporting equipment.  (SOF ¶¶ 7-10.)  Nor is there any evidence in the record that LVM intends to enter these markets or to "preserv[e] [such] avenues of expansion."  *Hormel Foods*, 73 F.3d at 504 (quotation omitted).  Thus, this factor cuts against a finding of confusion.

### E.      There Is No Evidence of Actual Consumer Confusion

LVM has presented no evidence of actual consumer confusion, which, although not dispositive, is probative.  *See Savin Corp. v. Savin Group*, 391 F.3d 439, 459 (2d Cir. 2004).  LVM offered a survey conducted by Dr. John Hauser,[8] and HMA produced a survey by Dr. Yoram ("Jerry") Wind.  The results of both surveys convincingly demonstrate only minimal, non-actionable levels of confusion.  Dr. Wind's study shows that merely 3% of likely Hyundai Sonata consumers considered LVM and HMA to be affiliated, and only 6% thought permission or authorization was needed to create the Commercial.  (SOF ¶ 62 (combined net total confusion, without double counting, is 8%).)  Dr. Hauser's data reveals that no more than 7.64% of likely

---

[7]    This case is even clearer than *GTFM*, where the challenged mark was used on the same type of product—clothing—that the plaintiff sold.  *Id.*  Here, there is no dispute that LVM does not sell basketballs.

[8]    HMA reserves the right to move *in limine* to exclude Dr. Hauser's report, *inter alia*, for failing to use a proper control, surveying an incorrect universe, and using leading and inaccurate questions.  (SOF ¶ 68.)

Hyundai purchasers were confused about permission.[9] (*Id.* ¶ 68.)  LVM's own survey results thus closely track the 6% generated by HMA's study as to permission (*Id.* ¶ 69),[10] and both reports not only fail to raise an issue of fact on confusion but actually are probative of a *lack* of confusion.  *See* 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 32:189 (4th ed. 2011) ("When the percentage results of a confusion survey dip below 10%, they can become evidence which will indicate that confusion is not likely."); *see also Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 321-22, 324 (S.D.N.Y. 2000) (finding no infringement where parties' surveys showed only 5% and 14.5% confusion), *aff'd* 234 F.3d 1262 (2d Cir. 2000) (unpublished).  Therefore, this factor weighs in favor of HMA.

## F.     There Is No Evidence of Bad Faith

The undisputed evidence shows that HMA did not intend to "deceiv[e] consumers into believing that its products or services were related to" LVM; accordingly, there is no evidence of bad faith.  *See N.Y. Stock Exch.*, 293 F.3d at 556 & n.1; *see also* 4 *McCarthy* § 23:113 ("[T]he only relevant intent is intent to confuse.  There is a considerable difference between an intent to copy and an intent to deceive.").  HMA did not intend for the patterned basketball to sow confusion, but rather to *distinguish* the Sonata from items considered luxurious based only on

---

[9]     Dr. Hauser's report makes the irrelevant assertion that "[o]f the viewers who recognized the design on the ball as [LVM's], 62% believed [HMA] had had [LVM's] authorization or permission to use the design in the advertisement."  When Dr. Hauser's findings are adjusted for the correct base and universe of prospective purchasers, as they must be, 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, §§ 32:159, 32:161 (4th ed. 2011), the resulting figure is 7.64% confusion.  (SOF ¶ 68.)

[10]    Against the total universe of all study respondents, Dr. Wind's study results show that 2% considered LVM and HMA to be affiliated, and 8% thought that permission or authorization was needed.  (SOF ¶ 61.)  The combined net level of confusion from Dr. Wind's survey is 9%, (*Id.*), a measure **identical** to the empirical data from Dr. Hauser's confusion study (*Id.* ¶ 65), with **both** indisputably minimal.

their high price.[11]  (SOF ¶¶ 28, 53.)  HMA's humorous intention precludes a finding of bad faith.  *See Haute Diggity Dog*, 507 F.3d at 263 (holding no bad faith where intent was not to confuse but "to do just the opposite—to evoke a humorous, satirical association that *distinguishes* the products."); *see also Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117-18 (2d Cir. 2009) (no bad faith where intent was to distinguish "Charbucks" coffee from "Starbucks" coffee).[12]

LVM's purported "bad faith" evidence does not create a triable issue of fact.  First, Innocean's efforts, as a matter of business practice, to seek approval from designer brands to use their *actual* products and *actual* marks, for free, in a wholly separate scene for the Commercial (SOF ¶ 22),[13] does not mean that approval was legally required.  Although that scene, if used, may have presented a closer question on confusion, the differences between that scene and the one at issue here make all the difference.  The fanciful use and setting of a fictional, "designer" basketball on a marble court with a gilded hoop intentionally do not confuse and undermine any finding of bad faith.  *See Hormel Foods*, 73 F.3d at 505 ("[T]he lack of subtlety in Henson's parody is evidence in itself that Henson intended no deceit."); *N.Y. Stock Exch.*, 293 F.3d at 556 & n.1 ("[E]ven the least-sophisticated consumers would understand and detect humor in the Casino's theme.").

---

[11]   In this regard, "the defendants' good faith [is] . . . evidenced by the fact that the source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks."  *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997).

[12]   HMA's fleeting use further undermines any finding of bad faith.  *See Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 635 (S.D.N.Y. 2008) (noting that "mere appearance" of plaintiff's pinball machine in defendant's movie was insufficient to show bad faith) (citing *Caterpillar Inc. v. Walt Disney Co.*, 287 F. Supp. 2d 913, 919-20 (C.D. Ill. 2003))).

[13]   This scene was shot, but not included in the final cut of the Commercial.  (SOF ¶ 30.)

Second, that HMA ran the Commercial again after receiving both the cease and desist letter and complaint "cannot demonstrate bad faith standing alone." *O'Keefe*, 590 F. Supp. 2d at 525. "If a defendant reasonably believes its mark does not infringe plaintiff's, she does not act 'with the [requisite] intention of capitalizing on plaintiff's reputation and goodwill.'" *Id.* (quoting *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993)); *see also Tommy Hilfiger*, 221 F. Supp. 2d at 412-13, 419-20. The undisputed evidence shows that, upon receipt of LVM's cease and desist letter, HMA executives met, awaited an opinion from HMA's general counsel whether to proceed, retained outside counsel, and ultimately determined that there was no reason, legal or otherwise, not to run the Commercial. (SOF ¶¶ 38-42.) This is insufficient to show bad faith.

LVM's "bad faith" arguments demonstrate nothing more than that LVM does not approve of the alleged use of its marks in the Commercial.[14] Particularly in an expressive use such as this, bad faith does not arise because a plaintiff is not amused by or does not approve of a joke; rather the touchstone is intent to deceive. *See Hormel Foods*, 73 F.3d at 500, 505; *Tommy Hilfiger*, 221 F. Supp. 2d at 412-13, 419-20.

### G. The Respective Quality of the Products Is Unlikely To Cause Confusion Where They Occupy Unrelated Markets

Where, as here, the parties' products occupy distinct markets, any similarity between the quality of the products is unlikely to cause confusion. *See Savin Corp.*, 391 F.3d at 461; *Hormel Foods*, 73 F.3d at 505. Thus, to the extent one could even compare the "quality" of a designer handbag to a $20,000 automobile, this factor would not support a finding of confusion.

---

[14]   Taken to its extreme, if a plaintiff's displeasure alone were sufficient to show bad faith, every trademark case would automatically result in a finding of bad faith.

### H.   The Parties' Consumers Are Sophisticated

The final *Polaroid* factor cuts against a finding of confusion because both LVM's and HMA's consumers are sophisticated.   Automobile purchasers are undeniably sophisticated, as there is a "fairly detailed purchasing process" coupled with "paying a substantial amount of money for the product."   *See Arrow Fastener*, 59 F.3d at 399 (quotation omitted); *see also GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*, 769 F. Supp. 2d 630, 647-48 (S.D.N.Y. 2011) (noting that confusion is low where price is high and consumers exercise a great deal of attention and care before making a purchase).   In addition, courts have found LVM's purchasers are sophisticated.   *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 389 (S.D.N.Y. 2008).   This factor therefore weighs in HMA's favor.

### I.   A Balancing of the *Polaroid* Factors Shows No Likelihood of Confusion

A balancing of the foregoing factors, which is a purely legal inquiry for the Court, *Arrow Fastener*, 59 F.3d at 391, shows that HMA is entitled to summary judgment on LVM's federal and state infringement and unfair competition claims.   *See Dooney & Bourke*, 561 F. Supp. 2d at 389-90 ("Summary judgment on a trademark infringement claim is appropriate where the *Polaroid* analysis reveals that 'undisputed evidence would lead to only one conclusion.'" (quoting *Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996))).   None of the factors weighs in favor of a finding of confusion.   This is especially so against the backdrop of First Amendment principles.   *See* Section I, *supra*.   Accordingly, HMA is entitled to judgment in its favor.

### III.   HMA IS ENTITLED TO JUDGMENT ON LVM'S DILUTION CLAIMS

LVM's federal dilution claim fails as a matter of law because (1) HMA's use of the patterned basketball is protected by the statutory fair use defense, 15 U.S.C. § 1125(c)(3)(A)(ii),

and (2) LVM nevertheless is unable to meets its burden of proof as to dilution by blurring or by tarnishment.  *See id.* § 1125(c).[15]

### A.      The Commercial Is Protected by the Fair Use Defense

The statutory fair use defense protects HMA's use of a design evocative of the LVM Marks in the Commercial's humorous commentary on luxury.  *See* § 1125(c)(3)(A)(ii).  The statute provides that "[a]ny fair use,"[16] including "identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner," is a complete defense to dilution.  *Id.*  The broad statutory language works in tandem with the First Amendment, *see* Section I *supra*, to protect the "use of a trademark in communicating an expressive or editorial message generally," including, but not limited to, parody.  *Charles Atlas*, 112 F. Supp. 2d at 337 n.10; *see also Yankee Publ'g*, 809 F. Supp. at 279.  Applying the statutory fair use defense bars LVM's dilution claim as a matter of law.

### B.      LVM Cannot Prove a Likelihood of Blurring

Even if the fair use defense did not apply, LVM's dilution claim still fails as a matter of law.  LVM has claimed, in essence, that its claim is proved because some people associated the patterned basketball with LVM.  But dilution by "'[b]lurring is not a necessary consequence of mental association,'" *Dooney & Bourke*, 561 F. Supp. 2d at 392 (quoting *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 434 (2003)), but instead it is association "that ***impairs the***

---

[15]   New York's anti-dilution statute, N.Y. GEN. BUS. LAW § 360-*l*, has been interpreted also to protect against both dilution by blurring and tarnishment.  *Starbucks*, 588 F.3d at 114.

[16]   The Trademark Dilution Revision Act of 2006 ("TDRA") amended its predecessor the Federal Trademark Dilution Act ("FTDA"), *inter alia*, to broadly exclude "[a]ny fair use" from federal trademark dilution.  152 CONG. REC. S1921, S1922 (daily ed. Mar. 8, 2006).  In its final form, the fair use protection was hailed as "definitively shelter[ing] important constitutionally protected first amendment [sic] freedoms from being caught up in the liability net."  *Id.* at S1923 (statement of Sen. Leahy).  Thus, the addition of the words "any fair use" was intended to make the TDRA at least coextensive with the First Amendment, if not even more expansive.

*distinctiveness* of the famous mark." § 1125(c)(2)(B) (emphasis added).  The Lanham Act's "six non-exhaustive factors," *see Starbucks*, 588 F.3d at 105-06, provide only a framework for the blurring analysis, as Congress intended for courts to consider "all relevant factors" when evaluating such claims.  § 1125(c)(2)(B); *accord* H.R. Rep. No. 109-23, at 7 (2005), *reprinted in* 2006 U.S.C.C.A.N. 1091, 1096.   One such critical factor is the expressive nature of the Commercial.  *Haute Diggity Dog*, 507 F.3d at 267.  An application of all of these factors shows that LVM cannot prevail on its dilution claim.[17]

### 1.   The Marks Are Not Similar

As discussed in Section II.B *supra*, the **contextual** differences between the patterned basketball and the LVM Marks render the two designs not confusingly similar.  *See Starbucks*, 588 F.3d at 116 (applying same analysis of similarity of marks for dilution and infringement). The Second Circuit has stressed that in assessing marks' similarity, courts "should weigh *all* aspects of the related trade dress and commercial setting of the marks."  4 *McCarthy* § 24:117 (citing *Starbucks*, 588 F.3d at 106).   Here, the satirical context is paramount and underscores how the marks are not similar.  For one second of a 30-second car commercial, the challenged pattern appeared on a *basketball*—not a handbag, luxury item, or even the car itself—alongside other absurd juxtapositions of symbols of luxury.[18]  (SOF ¶¶ 16-17.)  The Commercial also contains repeated references to Hyundai's own name and trademark—a dissimilarity that could

---

[17]     HMA does not dispute the second and fourth factors that the LVM Marks are distinctive and widely recognized, respectively.  *See* 15 U.S.C. § 1125(c)(2)(B)(ii), (iv).

[18]     The assessment of similarity cannot be based solely on the director's written recommendation, which displays the LVM Marks and the proposed design side-by-side.  (SOF ¶ 27.)  That document cuts against a finding that the marks are similar because it shows how the director took care to "adopt[] *imperfectly*" to "imitate and suggest, but not *use*, the marks of a high-fashion LOUIS VUITTON handbag" on the basketball to communicate luxury in a split second.  (*Id.* ¶ 28.)  *See Haute Diggity Dog*, 507 F.3d at 268.  Such use is "not so similar as to be likely to impair the distinctiveness of LVM's famous marks."  *Id.*

alone defeat the blurring claim.  (*Id.* ¶¶ 15-16.)  *Hormel Foods*, 73 F.3d at 506.  Finally, as LVM

is well aware, courts have found no dilution of the LVM Marks where the defendants' marks

were just as similar to the LVM Marks as those at issue here.  *See, e.g.*, *Dooney & Bourke*, 561

F. Supp. 2d at 390-91 (observing "fundamental differences distinguish the marks" used by LVM

and a competing handbag designer).

### 2.   LVM Is Not Engaged in Substantially Exclusive Use of Its Marks

Although LVM professes to have a "zero tolerance policy" against trademark violations

(SOF ¶ 71), LVM is aware of at least three music artists who have used its marks and/or products

without authorization in widely distributed videos and album covers.  (*Id.* ¶¶ 72-73.)  LVM

deems these uses to both infringe and dilute the LVM Marks but inexplicably has decided not to

enforce its trademark rights against these parties.  (*Id.*)  In addition, despite its representations

that it never licenses its trademarks, LVM has permitted Tiffany & Co., the luxury jewelry

company, █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.  (*Id.*

¶ 74.)  Finally, LVM gives its products to celebrities for free to promote the LVM brand.  (*Id.*

¶ 75.)  Rather than adhering to its purported zero-tolerance approach, LVM cherry-picks its

enforcement of the LVM Marks, allowing considerable leeway for its peer high-end brands and

celebrities and thus itself furthering its societal association with luxury.

### 3.   Hyundai Intentionally Associated with LVM To Advance the Commercial's Expressive Message

There is no genuine issue of material fact that the Commercial intended to create an

association with luxury by invoking the LVM Marks, among many other devices.  (SOF ¶ 28.)

In 2010, LVM was ranked by one survey as the number one luxury brand (*Id.* ¶ 6), and the

Commercial evoked the LVM Marks to communicate luxury in a split second.  (*Id.* ¶ 28.)  While

the Commercial "intentionally associated its marks" on the basketball amidst other absurd juxtapositions of luxury, this association was "only partial[] and certainly imperfect[], so as to convey the simultaneous message that [Hyundai] was not in fact a source of LVM products." *Haute Diggity Dog*, 507 F.3d at 268. Accordingly, the pattern evocative of the LVM Marks was placed on a basketball to distinguish the concepts of old luxury and redefined luxury (SOF ¶ 28); this deliberate effort was taken to "separate[] [the marks on the basketball] from the LVM [M]arks in order to make fun of" what they represent. *Id.* This kind of expressive association does not establish that the distinctiveness of the LVM Marks is likely to be impaired and  is "[a]n example of where 'association' is not synonymous with 'blurring.'" 4 *McCarthy* § 24:116; *see Haute Diggity Dog*, 507 F.3d at 268.

4.   <u>There is No Actual Association That Blurred the Distinctiveness of the LVM Marks</u>

Perhaps the biggest deficiency in LVM's dilution by blurring claim is the lack of evidence of "[a]ny actual association" between the marks that blurred the distinctiveness of the LVM Marks. *See* 15 U.S.C. § 1125(c)(2)(B)(vi). LVM's claim is fatally flawed because LVM has not identified a likelihood that *actual consumers* will make an association between the basketball and LVM Marks that is likely to impair the distinctiveness of the LVM brand. *See* 4 *McCarthy* § 24:116 ("If the ordinary consumer does *not* make the required 'association' between the conflicting marks, then the injury of blurring is not likely."); *Hormel Foods*, 73 F.3d at 506. LVM's expert explicitly chose not to test for dilution.[19] (SOF ¶ 66.) *See Miss Universe, L.P. v. Villegas*, 672 F. Supp. 2d 575, 595 (S.D.N.Y. 2009) (holding "the conspicuous absence of

---

[19] The Court may draw an adverse inference based on LVM's failure to present any survey evidence on dilution. *See M & G Elecs. Sales Corp. v. Sony Kabushiki Kaisha*, 250 F. Supp. 2d 91, 104 (E.D.N.Y. 2003) (drawing adverse inference against plaintiff for failure to present consumer survey evidence).

18

[survey] evidence" entitled defendants to judgment on the dilution claim).   LVM has not proffered any other evidence showing that dilution is likely: LVM has not identified a single admissible instance where a member of the public associated the Commercial with LVM; nor has any consumer ever contacted LVM directly about the Commercial.  (SOF ¶¶ 57-58.)

Given the Commercial's fleeting visual of the basketball, this dearth of real-world instances of brand association is unsurprising.  Also unsurprising is HMA's survey data, in which the vast majority of respondents to Dr. Wind's survey did not even notice LVM in the Commercial; only 19% of all respondents identified LVM as a brand shown.  (*Id.* ¶ 63.)  Such a low level of association does not give rise to actionable dilution.  *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 380-81 (D.N.J. 2002) (concluding that "a dilution level of 14% . . . is less than half of the lowest percentage of dilution in any reported decision basing a finding of dilution on a survey." (citing *WAWA Dairy Farms v. Haaf*, No. 96-4313, 1996 WL 460083 (E.D. Pa. Aug. 7, 1996) (29% dilution))); *cf. Nike, Inc. v. Nikepal Int'l, Inc.*, No. 2:05-cv-1468, 2007 WL 2782030, at *4 (E.D. Cal. Sept. 18, 2007) (finding evidence of actual dilution where 87% of survey respondents associated Nikepal with Nike).   Where, as here, "a defendant introduces significant evidence to show that dilution is unlikely," survey evidence from the plaintiff may then be needed to establish that dilution is likely.  *See Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1091 (9th Cir. 2010).  LVM presented none.  (SOF ¶ 66.)

Even for those people who associated LVM with the basketball in the Commercial, such association "does not mean that there is also a likelihood of dilution by blurring or tarnishment." 4 *McCarthy* § 24:116.  Courts have consistently held that the use of a mark similar to a famous mark in the context of an expressive work "tends to increase public identification of a plaintiff's mark with the plaintiff."  *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1490 (10th

Cir. 1987) (quotation and citation omitted); *see also Hormel Foods*, 73 F.3d at 506 (same);

*Tommy Hilfiger*, 221 F. Supp. 2d at 422 (same); *Yankee Publ'g*, 809 F. Supp. at 282 (same).

Reinforcing the ability of a plaintiff's marks to identify a single source is quite the opposite of

blurring, *i.e.* "impair[ing] the distinctiveness of the famous mark." *See* § 1125(c)(2)(B).  LVM is

unable to show a likelihood that the patterned basketball will weaken the association between the

LVM Marks and LVM's products, or that people will now think of basketballs or automobiles,

instead of handbags, upon encountering the LVM Marks.  *See Hormel Foods*, 73 F.3d at 506;

*Dooney & Bourke*, 561 F. Supp. 2d at 392 (noting that blurring requires evidence of "'any

lessening of the capacity'" of LVM Marks "'to identify and distinguish [its] goods or services'"

(quoting *Moseley*, 537 U.S. at 434)); *see Jordache*, 828 F.2d at 1491 (finding "actionable

association" is only "association of the *source* of the marks" (emphasis added)); *see also* 4

*McCarthy* § 24:116 (observing a likelihood of association "always" exists in a parody (citing

*Haute Diggity Dog*, 507 F.3d at 267)).  LVM has thus failed, for this and the other above

reasons, to establish dilution by blurring under federal and state law.[20]

### C.      LVM Cannot Prove a Likelihood of Tarnishment

"The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative

associations through defendant's use."  *Hormel Foods*, 73 F.3d at 507; *see* 15 U.S.C.

§ 1125(c)(2)(C).  Viewing the facts in the light most favorable to LVM, there is no evidence that

---

[20]  LVM's dilution by blurring claim under New York law, N.Y. GEN. BUS. LAW § 360-*l*, also must fail as a matter of law.  New York's blurring statute places a higher burden on plaintiffs than the TDRA: "New York law does not permit a dilution claim unless the marks are 'substantially' similar." *Starbucks*, 588 F.3d at 114 (citing *Playtex Prods.*, 390 F.3d at 167).  For the reasons stated in Sections II.B and III.B.1 *supra*, the design on the basketball is not similar— much less substantially similar—to the LVM Marks, and therefore LVM's state law claim for dilution by blurring must fail.  *See, e.g.*, *Playtex Prods.*, 390 F.3d at 167 (rejecting state dilution claim because "Wet Ones" pre-moistened wipes and "Quilted Northern Moist Ones" pre-moistened wipes are not substantially similar); *Hormel Foods*, 73 F.3d at 506.

LVM already has or is likely to suffer any negative associations to the LVM Marks as a result of the Commercial.

First, dilution by tarnishment "generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product."  *Deere*, 41 F.3d at 43.[21]  Here, there is nothing shoddy or unsavory about the Sonata or the Commercial itself that is likely to evoke unflattering thoughts about LVM.  *Cf. Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 525 (S.D.N.Y. 2009) (finding tarnishment where defendants exhibited plaintiff's mark at an adult entertainment exhibition).  In fact, quite the opposite is true:  in 2010, a valuable brand study recognized the Hyundai brand as "fast-growing" and "especially well-positioned" because it "offered sharp styling at a competitive price, providing the kind of value proposition that appealed to recession-weary shoppers."  (SOF ¶ 56.)  *See Starbucks*, 588 F.3d at 111 (concluding a product marketed as "very high quality" is inconsistent with the concept of tarnishment).  This apt description of Hyundai echoes the message of the Commercial, which aimed to convey to consumers, during a global recession, that the Sonata offered amenities on par with luxury automobiles at an affordable price.  (SOF ¶ 13.)

Second, even if HMA and/or the Sonata were deemed shoddy or unsavory (which they are not), "[t]hat a consumer may associate a negative-sounding junior mark with a famous mark says little of whether the consumer views the junior mark as harming the reputation of the famous mark."  *Starbucks*, 588 F.3d at 110 (finding that "a mere association between 'Charbucks' and 'Starbucks,' coupled with a negative impression of the name 'Charbucks,' is

---

[21]   The Second Circuit has since noted that "*Deere* is better understood as a recognition of a broad view of tarnishment, where that doctrine had been sometimes narrowly confined." *Hormel Foods*, 73 F.3d at 507.

insufficient to establish a likelihood of dilution by tarnishment"); *see Tommy Hilfiger*, 221 F. Supp. 2d at 423 (concluding tarnishment unlikely "[w]hen the association is essentially a harmless, clean pun" (quotation and citation omitted)).  That Hyundai and LVM are not direct competitors (SOF ¶ 54), where the reputation of one would directly affect that of the other, renders dilution by tarnishment even more remote.  *Hormel Foods*, 73 F.3d at 507-08.  *Cf. Deere*, 41 F.3d at 45 ("[A]lterations [to trademarks] accomplished for *the sole purpose of promoting a competing product* [constitute dilution]." (emphasis added)).

Finally, LVM has proffered no evidence that the Commercial is likely to harm the reputation of the LVM Marks, as its expert, Dr. Hauser, did not test for tarnishment in his consumer survey.   (SOF ¶ 66.)   By contrast, Dr. Wind's survey results unequivocally demonstrate that the Commercial did not negatively affect respondents' perceptions of LVM: *not even a single* respondent said that the Commercial caused him/her to feel less favorably about the LVM brand.  (SOF ¶ 63.)  Consequently, LVM's dilution by tarnishment claim must fail as a matter of law.[22]

## IV.   HMA IS ENTITLED TO SUMMARY JUDGMENT ON LVM'S CLAIM FOR HMA'S PROFITS[23]

LVM's lone remaining damages claim is for HMA's profits.[24]  The purpose of awarding profits—an equitable remedy—is to deter a willful infringer from future bad conduct.  *George*

---

[22]   For the same reasons, judgment must also be awarded to Hyundai on the corresponding tarnishment claim brought under New York law.  *See Starbucks*, 588 F.3d at 114 (finding plaintiff failed to establish by dilution by tarnishment under New York law for the same reasons it failed to establish dilution by tarnishment under federal law).

[23]   The Amended Complaint also seeks an injunction, but LVM has set forth no evidence sufficient to show irreparable harm from the Commercial.  *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Salinger v. Colting*, 607 F.3d 68, 74-75, 80 (2d Cir. 2010); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, No. 09 Civ. 9476, 2011 WL 1842980, at *19-*20 (S.D.N.Y. May 13, 2011).

*Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1539-40 (2d Cir. 1992).  In order to disgorge HMA's profits, LVM must prove that HMA "acted with willful deception," *id.* at 1540, that it "willfully intended to trade on the recognition" of LVM, 15 U.S.C. § 1125(c)(5)(B)(i), or that it "willfully intended to harm the reputation" of LVM, § 1125(c)(5)(B)(ii).  There is no such evidence.  As set forth in Section II.F., *supra*, HMA's clear humor and intended distinction between the spurious vignettes and the common-sense Sonata undermine any finding of willfulness.

Even if LVM could somehow prove that HMA acted willfully, there is no probative evidence from which a jury could conclude that even one Sonata sale resulted from HMA's one-second use of a patterned basketball in a commercial that aired five times.  As an initial matter, it is impossible to quantify the effect a particular advertisement or even an entire advertising campaign[25] had on sales, because consumers consider a number of factors before making a substantial purchase such as an automobile.[26]  (SOF ¶ 44.)  HMA executives made clear that the

---

[24]   LVM's damages theory has been a moving target.  LVM originally indicated that it would seek damages to its brand and in the form of a reasonable royalty.  (SOF ¶¶ 77-78.)  It has since expressly waived its claim to its own damages, and it has produced no evidence, expert or otherwise, in support of a reasonable royalty theory.  (*Id.*)  Thus, the only theory on which LVM appears to be proceeding is for disgorgement of HMA's profits.  (*Id.* ¶ 79.)

[25]   HMA spent tens of millions of dollars advertising and promoting its completely redesigned Sonata, including four other Sonata ads that aired during the Super Bowl and advertising and public relations efforts.  (SOF ¶ 12.)  In addition, other factors, such as the improving economy and competitor Toyota's struggles, likely affected sales.  (*Id.* ¶ 52.)

[26]   In an attempt to do just this, LVM has proffered the expert report of Laura B. Stamm of Analysis Group, but the conclusions expressed therein should be afforded no weight.  Ms. Stamm, an economist, spends the first 24 pages of her 30-page report discussing marketing issues and opining as to the "success" of the Commercial and the "importance" of the patterned basketball to the Commercial.   The six pages of her report that do purport to address damages rely solely on Ms. Stamm's wholesale application of an average "advertising elasticity" (*i.e.*, the increase in sales resulting from an increase in advertising spending) for a number of year-long advertising campaigns for non-durable goods, such as food and cleansers.  (SOF ¶ 79.)  Putting aside the fact that Ms. Stamm has no expertise whatsoever in this area, the application of results from year-long advertising campaigns (not single commercials) for wholly unrelated product

purpose of advertising is not to drive sales directly, but instead to drive "consideration," *i.e.*, to convince consumers to put Hyundai on their shopping list. (*Id.* ¶ 45.) Even LVM's own damages expert admitted that awareness of a product through an advertisement does not result directly in sales. (*Id.* ¶ 81.) Instead, an advertisement is just a first step in a buying process that typically includes research and evaluation, such as word of mouth recommendations, prior related experience, Internet research, dealer visits, and test drives. (*Id.* ¶¶ 44, 81.)

Even with data showing the number of vehicles sold because of the Commercial, there are no facts to support, and no reasonable jury could find, that *any* Sonata sales were attributable to the five seconds of total air time of the pattern evocative of the LVM Marks (a one-second appearance in a commercial that aired five times). *See George Basch*, 968 F.2d at 1540 (noting that court may determine "degree of certainty that the defendant benefited from the unlawful conduct" in determining whether to award profits"); *L & L Wings, Inc. v. Marco-Destin Inc.*, 756 F. Supp. 2d 359, 367 (S.D.N.Y. 2010) (granting summary judgment for defendant on plaintiff's claim for profits where profits were more likely "overwhelmingly attributable" to factors other than use of plaintiff's mark). As LVM's expert acknowledged, there are many other visual images in the Commercial itself, chief among them the ten-second appearance of the Sonata and HMA's logos. (SOF ¶¶ 15-16, 82.) Indeed, given the fleeting use of the ball, there is no reason to believe the Commercial would not have been effective without it. (*Id.* ¶ 85.) Assuming the patterned basketball itself piqued some consumers' initial interest, it is simply not plausible that any of those consumers spent approximately $20,000 or more on a vehicle solely on the basis of

categories is simply not probative in determining the number of car sales resulting from a single advertisement aired five times over the course of a month. (*Id.* ¶ 83.) Critically, the authors of the "advertising elasticity" study themselves caution against making any extrapolations from their study to any particular facts. (*Id.* ¶ 84.) Ms. Stamm herself did no empirical testing to determine any actual correlation between the ad and Sonata sales. (*Id.* ¶ 80.) HMA therefore reserves its right to exclude Ms. Stamm's report, if the Court finds a triable issue of fact exists.

that pattern, rather than on the basis of the car's design, amenities, safety ratings, handling, fuel economy, value, or warranty. (*Id.* ¶ 3.) LVM's experts provided absolutely no empirical data to the contrary.

In sum, HMA is entitled to summary judgment on LVM's claim for its profits because there is no evidence of willfulness and no evidence sufficient to show that Sonata sales were tied to HMA's use of the challenged pattern.

## CONCLUSION

For the foregoing reasons, HMA respectfully submits that there are no genuine issues of material fact on which LVM could recover at trial on any of its claims.  Accordingly, summary judgment should be entered in favor of HMA on all counts in the Amended Complaint.


Dated:  New York, New York
         July 22, 2011

QUINN EMANUEL URQUHART
 & SULLIVAN, LLP

By: Robert Raskopf / JBS
     Robert L. Raskopf
          robertraskopf@quinnemanuel.com
     Angela L. Harris
          angelaharris@quinnemanuel.com
     Julie B. Shapiro
          julieshapiro@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000

*Attorneys for Defendant Hyundai Motor America*